# United States Court of Appeals for the Federal Circuit

04-5092

DONALD MODEN and BARBARA MODEN,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee.

Ted L. McBride, Beardsley, Jensen & Von Wald, Prof. L.L.C., of Rapid City, South Dakota, argued for plaintiffs-appellants.

Katherine J. Barton, Attorney, Appellate Section, Environment and Natural Resources Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were Thomas L. Sansonetti, Assistant Attorney General, Mark Haag, Attorney, and, William Shapiro, Attorney, General Litigation Section.

Nancie G. Marzulla, Defenders Of Property Rights, of Washington, DC, for amicus curiae Defenders Of Property Rights.

Appealed from: United States Court of Federal Claims

Judge Lynn J. Bush

# United States Court of Appeals for the Federal Circuit

04-5092

DONALD MODEN, BARBARA MODEN,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee.

_____

DECIDED:  April 15, 2005
_____

Before MICHEL, <u>Chief Judge</u>, LOURIE, and PROST, <u>Circuit Judges</u>.

PROST, <u>Circuit Judge</u>.

Donald and Barbara Moden appeal the dismissal of their case by the United States Court of Federal Claims for lack of subject matter jurisdiction.  <u>See</u> <u>Moden v. United States</u>, 60 Fed. Cl. 275 (2004).  For the reasons stated herein, we treat the dismissal as a grant of summary judgment.  Because the Modens fail to raise a genuine issue of material fact with respect to at least one element of their claim, we affirm the grant of summary judgment.

BACKGROUND

A.  Factual Background

The Modens own a ranch located about five miles east of Ellsworth Air Force Base (EAFB) and near the town of Box Elder, South Dakota.  Since being activated in

1942, EAFB has served in various capacities as a support, training, maintenance, and testing facility for the United States Air Force. In particular, during the 1940s and 1950s routine aircraft maintenance activities at EAFB involved using trichloroethylene (TCE) to degrease airplane parts.

Since 1985, various governmental entities have commissioned studies to investigate the release of hazardous substances at EAFB as well as to develop, implement, and monitor appropriate responses to the release of those substances. In 1998 one of the commissioned studies identified that groundwater underneath the Modens' ranch was contaminated with TCE, a possible carcinogen. Researchers, including government experts, now believe that if contaminated groundwater migrated to the Modens' ranch from EAFB, the contamination may have been caused by the routine aircraft maintenance activities involving chemical solvents including TCE. While unable to identify with certainty the actual source of the contamination, government reports focus on two sites within EAFB known as Pride Hanger and Building 8115.

During the 1940s and 1950s, maintenance workers at Pride Hanger and Building 8115 used a mixture that included TCE to remove grease from airplane parts. At Pride Hanger, the TCE was stored in a large underground storage tank. After mixing the TCE with oil, maintenance workers would apply the mixture to the airplane parts before washing the mixture and grease off of the airplane parts using pressurized water. An industrial drainage system was used to collect the mixture, water, and grease for transport to an industrial water treatment plant.

The parties agree that the facilities and practices at EAFB met or exceeded state and federal requirements for storage and use of hazardous substances. They also

04-5092                                                    2

agree that there is no evidence that TCE was intentionally or even accidentally dumped into the groundwater by anyone at EAFB. Nevertheless, they agree that TCE is currently present in the groundwater under the Modens' ranch and that projections indicate that the duration of the contamination may be as long as fifty years.

## B. Procedural Background

On May 15, 2001, the Modens filed suit against the United States in the Court of Federal Claims, alleging that their property was contaminated by TCE as the result of government actions amounting to a taking under the Fifth Amendment to the United States Constitution. They specifically argued that the government actions constituted an inverse condemnation of their property.

The United States moved for judgment on the pleadings or, in the alternative, for summary judgment on the grounds that, inter alia, the Modens failed to state a claim upon which relief could be granted and that the Court of Federal Claims lacked jurisdiction because the Modens' claim sounds in tort. After the Court of Federal Claims permitted some discovery, the United States renewed its motion.

On April 9, 2004, the Court of Federal Claims granted the motion and dismissed the complaint for lack of subject matter jurisdiction. The Court of Federal Claims first noted that, while it is authorized to exercise jurisdiction over takings claims, it does not have jurisdiction over claims that sound in tort. 60 Fed. Cl. at 279. Then, it cited Ridge Line, Inc. v. United States, 346 F.3d 1346 (Fed. Cir. 2003), for the two-pronged test "that must be utilized in distinguishing a taking from a tort in inverse condemnation cases." 60 Fed. Cl. at 282. "[F]irst, a property loss compensable as a taking only results when the government intends to invade a protected property interest or the

asserted invasion is the direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action . . . ." Ridge Line, 346 F.3d at 1355. Second, "to constitute a taking, an invasion must appropriate a benefit to the government at the expense of the property owner, or at least preempt the owner's right to enjoy his property for an extended period of time, rather than merely inflict an injury that reduces its value." Id. at 1356.

The Court of Federal Claims then examined the evidence in this case under the identified two-pronged test. Under the first part of the first prong, the Court of Federal Claims noted that the Modens did not allege an intentional invasion by the United States. 60 Fed. Cl. at 283. Characterizing the second part of the first prong as an inquiry into the "foreseeability" of damage, the Court of Federal Claims listed "three occurrences [that] would have had to have been foreseeable or predictable by the Air Force at the time of its authorized use of the chemical solvents." Id. at 284-85. First, "during the 1940s and 1950s . . . the government would have had to have known that TCE was a component of these solvents and was a contaminant." Id. at 285. Second, the Modens "would have to show that it would have been predictable or foreseeable by the government that these chemical solvents, containing TCE, would have been released into the groundwater." Id. Third, the Modens "would have to show that the government should have foreseen that the contaminant would naturally migrate toward plaintiffs' property." Id. at 285-86.

The Court of Federal Claims ultimately concluded that the Modens either did not present evidence or did not contradict evidence presented by the United States with regard to the first or second occurrence. Instead, the Modens focused on the third

occurrence, which, according to the Court of Federal Claims, even if proved, alone would be insufficient for jurisdiction to be proper. Thus, because the Court of Federal Claims found that the Modens failed to satisfy <u>Ridge Line</u>'s first prong, it found subject matter jurisdiction to be lacking.[1]

The Court of Federal Claims entered a final judgment on April 14, 2004. The Modens timely appealed, and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

---

[1]    The Court of Federal Claims also "decline[d] to adopt the viewpoint set forth in dictum" in <u>Clark v. United States</u>, 19 Cl. Ct. 220 (1990), that "the same operative facts may give rise to both a taking and a tort." 60 Fed. Cl. at 288. Regardless of whether this viewpoint was set forth in dictum in <u>Clark</u>, several of our cases also indicate that the same operative facts may give rise to both a taking and a tort. <u>See</u> <u>Del-Rio Drilling Programs, Inc. v. United States</u>, 146 F.3d 1358, 1363 (Fed. Cir. 1998); <u>Rith Energy, Inc. v. United States</u>, 247 F.3d 1355, 1365 (Fed. Cir. 2001); <u>El-Shifa Pharm. Indus. Co. v. United States</u>, 378 F.3d 1346, 1353 (Fed. Cir. 2004). Moreover, the Supreme Court has indicated that by denying just compensation a governmental action may be both unconstitutional as well as tortious:

> The city argues that because the Constitution allows the government to take property for public use, a taking for that purpose cannot be tortious or unlawful. We reject this conclusion. Although the government acts lawfully when, pursuant to proper authorization, it takes property and provides just compensation, the government's action is lawful solely because it assumes a duty, imposed by the Constitution, to provide just compensation. When the government repudiates this duty, either by denying just compensation in fact or by refusing to provide procedures through which compensation may be sought, it violates the Constitution. In those circumstances the government's actions are not only unconstitutional but unlawful and tortious as well.

<u>City of Monterey v. Del Monte Dunes at Monterey, Ltd.</u>, 526 U.S. 687, 717 (1999) (citations omitted). Nevertheless, as discussed below, the question before us today is whether evidence in the record before us raises a genuine issue of material fact sufficient to avoid summary judgment with regard to a takings claim. Whether the government's actions separately give rise to a tort action is irrelevant to our disposition of this case.

DISCUSSION

A. Jurisdiction

The Court of Federal Claims dismissed the present case for what it deemed a lack of subject matter jurisdiction. 60 Fed. Cl. at 291. In doing so, however, the Court of Federal Claims addressed the merits of the Modens' nonfrivolous inverse condemnation claim. Thus, the Court of Federal Claims indicated a possible misunderstanding of the appropriate role of a trial court in addressing three different types of motions: a motion to dismiss a complaint for lack of subject matter jurisdiction; a motion to dismiss a complaint for failure to state a claim upon which relief can be granted; and a motion for summary judgment on the merits.

We have attempted to clarify the appropriate inquiries that a court must make in response to these types of motions. See, e.g., Spruill v. Merit Sys. Prot. Bd., 978 F.2d 679, 687-88 (Fed. Cir. 1992). The Court of Federal Claims has interpreted Spruill as suggesting that when a defendant disputes the merits of a claim in a motion to dismiss for lack of subject matter jurisdiction, jurisdiction should be assumed and the merits of the claim should be addressed. See, e.g., Janowsky v. United States, 31 Fed. Cl. 520, 521 (1994); Morris v. United States, 33 Fed. Cl. 733, 743 (1995).

In Spruill we concluded that subject matter jurisdiction exists when a petitioner asserts a nonfrivolous claim:

> To the extent a successful claim against the government requires compliance with all statutory elements of the claim, failure of proof of an element of the cause of action means the petitioner is not entitled to the relief he seeks. To conclude in such a case that the petitioner loses because the forum is "without jurisdiction" is to obscure the nature of the defect. It would be more accurate to conclude that the petitioner has failed to prove the necessary elements of a

04-5092                                        6

cause for which relief could be granted. The forum has jurisdiction to hear the matter in the first instance—that is, subject-matter jurisdiction existed—as long as the petitioner asserted nonfrivolous claims.

978 F.2d at 687-88. Similarly, the Supreme Court has identified that "[d]ismissal for lack of subject-matter jurisdiction because of the inadequacy of the federal claim is proper only when the claim is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy.'" Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 89 (1998) (quoting Oneida Indian Nation of N.Y. v. County of Oneida, 414 U.S. 661, 666 (1974)).

Confusion may have arisen here because jurisdiction in this case is governed by the Tucker Act. The Tucker Act grants the United States Court of Federal Claims jurisdiction over claims for money damages "against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2000); United States v. Mitchell, 463 U.S. 206, 216 (1983). Recently we noted:

> In Tucker Act jurisprudence [the] neat division between jurisdiction and merits has not proved to be so neat. In these cases, involving suits against the United States for money damages, the question of the court's jurisdictional grant blends with the merits of the claim. This mixture has been a source of confusion for litigants and a struggle for the courts.

Fisher v. United States, No. 02-5082, slip op. at 6 (Fed. Cir. 2005).

However, Fisher addressed how the Court of Federal Claims should determine whether the "Constitutional provision, statute, or regulation is one that is money-

mandating." Id. at 9. We concluded that the determination of whether a claim's source is money-mandating "shall be determinative both as to the question of the court's jurisdiction and thereafter as to the question of whether, on the merits, plaintiff has a money-mandating source on which to base his cause of action." Id. Here the parties do not dispute that the Takings Clause of the Fifth Amendment is money-mandating. Thus, to the extent the Modens have a nonfrivolous takings claim founded upon the Fifth Amendment, jurisdiction under the Tucker Act is proper.

The government neither argues that the Modens' claim is frivolous nor argues that it is so insubstantial, implausible, foreclosed by prior decisions, or otherwise completely devoid of merit as not to involve a federal controversy. And while at oral argument the United States repeatedly refused to concede that jurisdiction is proper in this case, it clearly is.

As discussed above, the United States admits that TCE is currently present in the groundwater under the Modens' ranch and the government's own experts believe that if contaminated groundwater migrated to the Modens' ranch from EAFB, the contamination may have been caused by the routine aircraft maintenance activities involving TCE. It is therefore clear, for example, that the Modens' claim of inverse condemnation is not made solely for the purpose of obtaining jurisdiction. See Steel Co., 523 U.S. at 89. In short, we have jurisdiction to address the merits of this case, as did the Court of Federal Claims, because the Modens' claim is neither frivolous nor so insubstantial, implausible, foreclosed by prior decisions, or otherwise completely devoid of merit as not to involve a federal controversy.

Although the Court of Federal Claims stated that dismissal was for lack of subject-matter jurisdiction, it is clear that the Court of Federal Claims concluded that the Modens failed to identify a genuine issue of material fact sufficient to avoid summary judgment. See Fed. R. Civ. P. 56(c). Thus, we treat the dismissal as a grant of summary judgment. Cf. Banks v. Garrett, 901 F.2d 1084, 1087 (Fed. Cir. 1990).

## B. Inverse Condemnation

### 1. Standard of Review

We review a grant of summary judgment in a takings case de novo. Sheldon v. United States, 7 F.3d 1022, 1026 (Fed. Cir. 1993). Summary judgment is only appropriate if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. R. of U.S. Ct. Fed. Cl. 56(c); Fed. R. Civ. P. 56(c). In reviewing the record, we must draw all justifiable inferences in favor of the party opposing summary judgment. Turner v. United States, 901 F.2d 1093, 1095 (Fed. Cir. 1990). Furthermore, due to the fact-intensive nature of takings cases, summary judgment should not be granted precipitously. Yuba Goldfields, Inc. v. United States, 723 F.2d 884, 887 (Fed. Cir. 1983).

### 2. Analysis

Inverse condemnation is a "shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted." United States v. Clarke, 445 U.S. 253, 257 (1980). It is a cause of action against the government to recover the value of property taken by the government without formal exercise of the power of eminent domain. Id.

In Ridge Line we identified a two-part analysis that a claim for inverse condemnation invokes. An inverse-condemnation plaintiff first must show that treatment under takings law is appropriate. 346 F.3d at 1355. To do so, it must clear two hurdles. First, it must show either that the government intended to invade a protected property interest or that the asserted invasion is the direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the activity. Id. Second, it must show that the invasion appropriated a benefit to the government at the expense of the property owner, at least by preempting the property owner's right to enjoy its property for an extended period of time, rather than merely by inflicting an injury that reduces the property's value. Id. at 1356. If treatment under takings law is appropriate, the inverse-condemnation plaintiff must then "show that it possessed a protectable property interest in what it alleges the government has taken." Id. at 1355.

We first address whether the Modens have identified a genuine issue of material fact with regard to whether treatment under takings law is appropriate. In this regard, the Modens do not attempt to show that the government actually intended to invade a protected property interest. Furthermore, the government concedes that the use of TCE on EAFB was authorized. Thus, the first question presented on the merits is whether the evidence presents a genuine issue of material fact with regard to whether the contamination of the Modens' ranch with TCE was the direct, natural, or probable result of the authorized use of TCE on EAFB and not the incidental or consequential injury inflicted by that action.

As a preliminary matter, the parties interpret the direct, natural, or probable result standard differently. The government contends that the resulting injury must be

foreseeable from the authorized government act, whereas the Modens and amicus curiae, Defenders of Property Rights, contend that the authorized government act need only be the "cause-in-fact" of the resulting injury. Simplified somewhat, the government's interpretation requires that the injury was the likely result of the act, whereas the Modens' interpretation requires only that the act was the likely cause of the injury. The government's interpretation finds support in the language of the standard, which refers to a "direct, natural, or probable result," not a direct, natural, or probable cause. The government's interpretation also finds support in our case law. In Ridge Line, we stated that the court must determine whether the alleged injury was the "predictable result of the government action." Id. at 1356. This Ridge Line interpretation itself finds support in a long line of controlling precedent. See, e.g., John Horstmann Co. v. United States, 257 U.S. 138, 146 (1921); Sanguinetti v. United States, 264 U.S. 146, 149-50 (1924); Eyherabide v. United States, 345 F.2d 565, 570 (Ct. Cl. 1965); Barnes v. United States, 538 F.2d 865, 872 (Ct. Cl. 1976); Pete v. United States, 531 F.2d 1018, 1035 (Ct. Cl. 1976). Thus, we conclude that, here, the Modens must point to some evidence presenting a genuine issue of material fact with regard to whether the contamination of the Modens' ranch with TCE was the foreseeable or

predictable result of the authorized use of TCE on EAFB.[2]

---

[2] Recently, we summarized the relevant aspect of Ridge Line as requiring that "a property owner must prove that the asserted government invasion of property interests allegedly effecting a taking 'was the predictable result of the government action,' either because it was 'the direct or necessary result' of the act or because it was 'within the contemplation of or reasonably to be anticipated by the government.'"

This conclusion does not mean that issues surrounding causation are irrelevant. On the contrary, causation must be shown. See Pashley v. United States, 156 F. Supp. 737, 738-39 (Ct. Cl. 1957). However, proof of causation, while necessary, is not sufficient for liability in an inverse condemnation case. See John Horstmann Co., 257 U.S. at 145-46. In addition to causation, an inverse condemnation plaintiff must prove that the government should have predicted or foreseen the resulting injury.

The Modens interpret several cases, including Cotton Land Co. v. United States, 75 F. Supp. 232 (Ct. Cl. 1948), as explicitly rejecting the foreseeability requirement. However, we, along with our predecessor court, have a different view of Cotton Land Co.:

> Plaintiffs point to Cotton Land Co. v. United States, which involved the eventual flooding of plaintiff's land through erection of a dam. Since the flooding did not occur directly from erection of the dam, but rather through a chain of events occurring in a natural order, but originally set in motion by the erection of the dam, the Government defended on the theory that erection of the dam was too remote a cause on which to base liability. The Court concluded that there has been a fifth amendment taking. <u>We rejected the 'remoteness of cause' defense by pointing out that the flooding of the land was foreseeable.</u> We looked to the law of torts on the remoteness issue, and found no intervening cause breaking the chain of causation. The Court concluded that the flooding was the 'actual and natural consequence of the Government's act.'

---

Vaizburd v. United States, 384 F.3d 1278, 1282-83 (Fed. Cir. 2004) (quoting Ridge Line, 346 F.3d at 1356) (citing Sanguinetti, 264 U.S. at 150; John Horstmann Co., 257 U.S. at 146; Barnes, 538 F.2d at 871; Eyherabide, 345 F.2d at 570; Columbia Basin Orchard v. United States, 132 F. Supp. 707, 709 (Ct. Cl. 1955); Cotton Land Co. v. United States, 75 F. Supp. 232, 233-34 (Ct. Cl. 1948)).

<u>Avery v. United States</u>, 330 F.2d 640, 644-45 (Ct. Cl. 1964) (emphasis added) (citation omitted). In other words, injury may not be foreseeable if an intervening cause breaks the chain of causation.

Turning to the evidence in the record of this case, as discussed above, the Court of Federal Claims identified three antecedent "occurrences" that it believed would have had to have been foreseeable or predictable at the time TCE was used on EAFB in order to conclude that contamination of the Modens' ranch with TCE was the direct, natural, or probable result of the use of TCE on EAFB. 60 Fed. Cl. at 284-85. Because these three antecedent factual questions provide a useful tool for organizing our inquiry and the Modens do not argue that they are improper predicates to the ultimate issue of the foreseeability of the contamination in this case, we adopt them with slight modifications. The Modens must point to evidence sufficient to identify a genuine issue of material fact that the government should have foreseen (1) that the chemical solvents included a contaminant;[3] (2) that the chemical solvents would be released into the groundwater; and (3) that the contaminant would naturally migrate to the Modens' ranch.

The Modens argue that the third factual question, migration, was the only debate between the parties and that, therefore, we should assume that the evidence supports holding a trial regarding the first two factual questions. As evidence that the first two questions were not in dispute, the Modens point out that the government's proposed

---

[3] The Court of Federal Claims looked to determine whether the government knew that TCE was a component of the chemical solvents and was a contaminant. That is too strict a requirement since it is subjective and requires specific knowledge regarding TCE. As the government concedes, foreseeability is an objective standard. Subjective foresight of injury is not required. See <u>Cotton Land Co.</u>, 75 F. Supp. at 235.

findings of uncontroverted fact make no mention of the state of the knowledge regarding TCE and its toxicity at any point in time. This argument misses the point. The burden is on the Modens to present evidence sufficient to create a genuine issue of material fact. While pointing to an admission by the government that it knew of TCE and its harmful characteristics would probably satisfy their burden with regard to the dangerousness of the chemical solvents, pointing out that the government did not admit these facts does not. Moreover, if the issue of migration really was the only debate between the parties then the proposed findings of uncontroverted facts might affirmatively state, for example, that the chemical solvents and/or TCE were known to be toxic at the time they were used at EAFB and that it was foreseeable that these substances would be released into the groundwater at EAFB. Also, the government presented arguments addressing the first two factual questions in a memorandum filed with the Court of Federal Claims in support of their summary judgment motion. The presentation of these arguments, regardless of their merit, contradicts the Modens' assertion that these issues were not debated by the parties. Thus, we conclude that the three factual questions were in debate.

With regard to the second factual question, the Modens must identify a genuine issue of material fact supporting the conclusion that the government should have foreseen the release of the chemical solvents into the groundwater. In determining that the Modens failed to identify a genuine issue of material fact on this issue, the Court of Federal Claims relied upon the following uncontroverted evidence: (1) there was no accidental or intentional dumping of chemicals; (2) EAFB utilized an industrial drainage system to dispose of waste water and chemical solvents; and (3) Pride Hanger and

Building 8115 met and/or exceeded federal and state requirements for use and storage of chemicals. 60 Fed. Cl. at 285. The uncontroverted evidence in the record also shows that EAFB utilized an industrial water treatment plant.

We agree with the Court of Federal Claims that the Modens failed to meet their burden on this second question in light of the uncontroverted evidence and further in view of the inability of the Modens to point to any evidence supporting the contention that the government should have foreseen the release of the chemical solvents into the groundwater. The evidence proffered by the government tends to show that use of TCE at EAFB would not directly, naturally, or probably result in the release of chemical solvents into the groundwater. The only relevant evidence cited by the Modens in their brief in opposition is the testimony of Dell Peterson, an engineer at EAFB. When asked whether he knew of any sources that could have caused the TCE contamination at issue in this case other than the Air Force's use of TCE, Peterson testified that "aircraft or parts cleaning is not the only potential for this kind of contamination. Underground leaks in drainage systems are possible." This evidence does not create a genuine issue of material fact because it can show, at most, that a government act was the cause-in-fact of the claimed injury, not that the injury was predictable from the act. See Ridge Line, 346 F.3d at 1356 (requiring that the claimed injury be the "predictable result of the government action").

While the existence of the drainage system and treatment plant points to some actual knowledge on the part of the government that chemical solvents should not be released into the groundwater because they are dangerous, the possibility of leaks in drainage systems generally does not create a genuine issue of material fact that the use

of chemical solvents at EAFB would directly, naturally, or probably result in their release into the groundwater.

On this point, the Modens' citation to <u>Pashley</u> is unavailing. While we agree that the government's liability for a taking does not turn, as it would in tort, on its level of care, 156 F. Supp. at 738, <u>Pashley</u> confirms that foreseeability of injury is a relevant consideration. <u>Pashley</u>, as well as other cases cited by the Modens, involve the flooding of private property due to the erection of dams by the government. We think it suffices to point out that in <u>Pashley</u> our predecessor court, while addressing causation, noted that the "Defendant knew that the impounding of the waters above the dam would probably cause the property below the dam to be inundated." <u>Id.</u> In other words, the government actually foresaw the injury it in fact caused. In contrast, here the Modens fail to point to any evidence in the record tending to show that the government actually predicted or should have predicted that the drainage system and treatment plant would release the chemical solvents into the groundwater.

When pressed at oral argument to identify why the government should have foreseen that the drainage system and treatment plant would release the chemical solvents into the groundwater, the Modens' counsel responded by stating that contamination may have come from other sources on EAFB, such as firing ranges, that did not utilize the drainage system or treatment plant. However, the record appears to be devoid of any evidence concerning whether the government should have foreseen that use of TCE at these firing ranges would release TCE into the groundwater. The only evidence concerning the firing ranges cited by the Modens is a statement by a government expert that indicates his belief that the most significant source of TCE is

likely associated with activities at these firing ranges. While this expert's opinion may be sufficient to establish a genuine issue of material fact with respect to causation and these firing ranges, it fails to establish a genuine issue of material fact with respect to the foreseeability of leakage of the chemical solvents into the groundwater at these firing ranges.

For these reasons, we agree with the conclusion of the Court of Federal Claims that the Modens have failed to identify a genuine issue of material fact supporting the conclusion that the government should have foreseen the release of the chemical solvents into the groundwater. We decline to address whether the government should have foreseen that the chemical solvents included a contaminant and that the contaminant would naturally migrate to the Modens' ranch.

Because we conclude that there is no genuine issue of material fact either that the government intended to contaminate the Modens' ranch or that the contamination of the Modens' ranch with TCE is the direct, natural, or probable result of the authorized use of TCE on EAFB, we find it unnecessary to address whether the contamination of the Modens' ranch preempted the Modens' right to enjoy their property for an extended period of time, rather than merely by inflicting an injury that reduces its value. We also find it unnecessary to address whether the Modens possessed a protectable property interest in what they allege the government has taken.

CONCLUSION

While dismissal for lack of subject matter jurisdiction was improper, summary judgment is appropriate because the Modens have failed to establish a genuine issue of material fact with regard to whether the contamination of their ranch with TCE is the

direct, natural, or probable result of the authorized use of TCE on EAFB. In particular, the Modens have failed to point to any evidence that the government should have foreseen the release of TCE into the groundwater on EAFB. For this reason, we affirm the judgment of the Court of Federal Claims.

<u>AFFIRMED</u>
