John H. and Mary E. BANKS, et àl., Plaintiffs,

v.

The UNITED STATES, Defendant.

Stone, Errol L. and Susan H. As Trustees of the Susan H. Stone Trust, Plaintiffs,

v.

The United States, Defendant.

Nos. 99–4451 L, 04–277 L.[1]

United States Court of Federal Claims.

Jan. 9, 2006.

---

1. By Order dated March 15, 2005, the court consolidated the related cases for the limited purpose of addressing the liability issues in the cases.

John B. Ehret, Olympia Fields, IL, for plaintiffs in No. 99–4451 L. Drew W. Marrocco, Washington, DC, for plaintiffs in No. 04–277 L.

Terry M. Petrie, Denver, CO, with whom was Kelly A. Johnson, Acting Assistant Attorney General, Environment & Natural Resources Division, United States Department of Justice, Washington, DC, for defendant.

## OPINION

HEWITT, Judge.

This is a takings action. Plaintiffs own property along the eastern shoreline of Lake Michigan south of St. Joseph Harbor.[2] *Banks v. United States*, 314 F.3d 1304, 1306 (Fed.Cir.2003) (*Banks II*); *Banks v. United States*, 62 Fed.Cl. 778, 778 (2004) (*Banks III*). Plaintiffs allege that the United States Army Corps of Engineers (Corps), by its construction and maintenance of certain jet-

---

**2.** For additional factual background, see *Banks v. United States*, 49 Fed.Cl. 806 (2001) (*Banks I*), rev'd, 314 F.3d 1304 (Fed.Cir.2003) (*Banks II*), cert. denied, 540 U.S. 985, 124 S.Ct. 486, 157 L.Ed.2d 376 (2003); *Banks v. United States*, 62 Fed.Cl. 778 (2004) (*Banks III*); and *Banks v. United States*, 68 Fed.Cl. 524 (2005) (*Banks IV*).

ties in St. Joseph Harbor, has effected a physical taking of plaintiffs' shoreline property. *Banks III*, 62 Fed.Cl. at 778–79. Plaintiffs specifically allege that the Corps' activities "have interfered with the natural littoral flow of sand and river sediment and caused damage to the lakebed" which has effected " 'a gradual and continued taking' " by eroding plaintiffs' shoreline property. *Banks II*, 314 F.3d at 1306; *Banks III*, 62 Fed.Cl. at 778–79. Liability is being determined in a consolidated proceeding comprising No. 99–4451 L (the Banks plaintiffs) and No. 04–277 L (the Stone plaintiffs). The factual distinctions between the *Banks* case and the *Stone* case are immaterial for purposes of the briefing before the court.

I. Background

In its initial decision in this matter, the court held that plaintiffs' claims were time-barred. *See Banks v. United States*, 49 Fed. Cl. 806, 826 (2001) (*Banks I*). The United States Court of Appeals for the Federal Circuit reversed, holding that plaintiffs' claims did not accrue until January 2000, the date the last of three reports issued by the Corps. These three reports, the 1996 Report, 1997 Report, and 1999 Report, "collectively indicated that [the shoreline] erosion was permanent and irreversible." *Banks II*, 314 F.3d at 1310. The Federal Circuit found that the Corps' issuance of the three reports brought to an end the "justifiable uncertainty" of plaintiffs, created during the Corps' mitigation efforts, about the permanency of the erosion. *See id.*

On remand, the court determined that the period of time over which a plaintiff's claim must be examined during the liability phase of trial is from the acquisition date of the plaintiff's property through the date of claim accrual in January 2000. *Banks v. United States*, 68 Fed.Cl. 524, 530–31 (2005) (*Banks IV*). The court also determined that the proper date for measurement of the high water mark is, at the earliest, 1950, which is

the date when the Corps began its thirty-nine year construction project of installing steel sheet pilings at the St. Joseph Harbor piers. *Id.* at 535. With respect to a particular plaintiff, the proper date for measurement of the high water mark is the date of the particular plaintiff's property acquisition. *Id.* at 535. The court noted in its opinion that "an unresolved legal issue to which defendant has adverted in its briefing and to which plaintiffs have not responded is whether any erosion caused by plaintiff's own efforts to mitigate damages by placing shore protection [revetments] on their properties is [3] 'chargeable' to the Corps." *Id.* (citation omitted). By separate Order dated June 23, 2005, the court directed the parties to brief the issue of "whether the Corps is [4] liable for any erosion caused by plaintiffs' own efforts to mitigate the damage from the Corps' activities in St. Joseph Harbor by placing shore protection on their respective properties." Order of June 23, 2005.

The initial briefing of the Banks plaintiffs was styled Answer as to Whether the Corps is Liable for Any Erosion Caused by Plaintiffs' Own Efforts to Mitigate the Damage from the Corps' Activities in St. Joseph Harbor by Placing Shore Protection on Their Respective Properties (Banks Pls.' Br.), and the initial briefing of the Stone plaintiffs was styled Brief on Liability for Alleged Contributory Erosion Caused by Protective Structures Installed by Landowners south of St. Joseph Harbor (Stone Pls.' Br.). Defendant responded to plaintiffs' briefs by filing Defendant's Response to Plaintiffs' Briefs Filed Pursuant to the Court's June 23, 2005 Order. The Stone plaintiffs replied by filing their Reply to Defendant's Response to Plaintiffs' Briefs Filed Pursuant to the Court's June 23, 2005 Order. The Banks plaintiffs did not further reply.

After the Banks plaintiffs filed their initial briefing in response to the court's June 23, 2005 Order, the government filed a Motion

---

**3.** The court notes that its choice of the present active indicative verb form "is" in the phrase "is 'chargeable' to the Corps" was inapposite. A more apt choice would have been "may be" because the liability of the Corps for beach erosion based on the Corps' activities in St. Joseph

Harbor, a necessary predicate to a conclusion concerning the legal impact of plaintiffs' shore protection, remains to be determined at trial.

**4.** *See supra* note 3.

for Partial Summary Judgment as to the Erosion Caused by Plaintiffs' Shore Protection. *See* Defendant's Memorandum in Support of Motion for Partial Summary Judgment as to the Erosion Caused by Plaintiffs' Shore Protection (Def.'s Mem.); *see also* Defendant's Proposed Findings of Uncontroverted Fact. Further to the government's motion, the Banks plaintiffs filed their Response to Defendant's Memorandum as to Whether the Corps is Liable for Any Erosion Caused by Plaintiffs' Own Efforts to Mitigate the Damage from the Corps' Activities in St. Joseph Harbor by Placing Shore Protection on Their Respective Properties (Banks Pls.' Resp.) and the Stone plaintiffs filed their Response and Opposition to Defendant's Motion for Partial Summary Judgment as to the Erosion Caused by Plaintiffs' Shore Protection (Stone Pls.' Resp.). Defendant replied in support of its motion in its Reply to Plaintiffs' Response and Opposition to Defendant's Motion for Partial Summary Judgement as to the Erosion Caused by Plaintiffs' Shore Protection (Def.'s Reply).

While briefing on the subject of revetments was underway, the Banks plaintiffs filed a Motion to Take Judicial Notice of the Michigan Supreme Court Ruling on July 29, 2005 in *Glass v. Goeckel* [,] Docket No. 126409 (Banks Pls.' Judicial Notice Mot.). Defendant filed its Opposition to Plaintiff Banks's Motion to Take Judicial Notice of the Michigan Supreme Court Ruling in *Glass v. Goeckel* (Def.'s Judicial Notice Opp.). The Banks plaintiffs filed their Reply to Defendant's Opposition Regarding Judicial Notice. In *Glass*, the Michigan Supreme Court determined that, under Michigan law, the ordinary high water mark "marks the boundary of land ... included within the public trust." 473 Mich. 667, 703 N.W.2d 58, 71–72 (2005). The Michigan Supreme Court specifically addressed the "factors [that] will serve to identify the ordinary high water mark [under Michigan law], but [noted that] the precise location of the ordinary high water mark at any given site on the shores of [Michigan's] Great Lakes remains a question of fact." *Glass*, 703 N.W.2d at 73. The Banks plaintiffs urge the court to "adopt the [ordinary high water mark] according to Michigan law as the location above which to measure ero-

sional damages for Just Compensation under the 5th Amendment of the U.S. Constitution." Banks Pls' Judicial Notice Mot. at 3–4. Because the court has determined that "[t]he federal navigational servitude defines the boundaries within which the government may supersede private ownership interests to improve navigation," *see Banks IV*, 68 Fed. Cl. 524, 531 (2005) (internal quotations and citation omitted), and because, as defendant correctly points out, the *Glass* decision "does not address or decide the scope of the federal navigational servitude," *see* Def.'s Judicial Notice Opp. at 5, the court declines to take judicial notice of the *Glass* decision and DENIES the Banks plaintiffs' Judicial Notice Motion.

The court now addresses the parties' arguments regarding liability for any damages caused by plaintiffs' revetments.

## II. Discussion

### A. Standard of Review

A court may grant summary judgment when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Rules of the United States Court of Federal Claims (RCFC) 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1302 (Fed.Cir.2005). A fact that might significantly affect the outcome of the litigation is material. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Disputes over facts that are not outcome-determinative will not preclude the entry of summary judgment. *See id.* "[A]ll justifiable inferences" must be drawn in favor of the party opposing summary judgment. *Cross Med. Prods., Inc.*, 424 F.3d at 1302.

"[W]hen appropriate to the circumstances," a court may render summary judgment in a takings case. *Avenal v. United States*, 100 F.3d 933, 936 (Fed.Cir.1996). Rule 56 contemplates that the court may grant a partial summary judgment. *See* RCFC 56(d).

B. Whether Plaintiffs' Allegations Concerning the Corps' Activities in St. Joseph Harbor State a Claim for a Taking by Erosion of Plaintiffs' Properties

Both parties used the occasion of the briefing to argue generally the underlying question of whether the activities of the Corps in St. Joseph Harbor caused the erosion of plaintiffs' shoreline. Plaintiffs assert that the Corps' construction and maintenance of the St. Joseph Harbor jetties took their shoreline property, "specifically, [that] the steel sheet piling installed in the 1950s created a wall blocking the sand that otherwise would have traveled south and protected the shoreline [south of St. Joseph Harbor] from erosion."[5] Stone Pls.' Br. at 2. Plaintiffs assert that "as a result of the continuous erosion that those structures have wrought, many residents living along the shore south of the harbor have taken steps to protect their property by constructing various types of erosion protection structures ('sea walls')." Id. at 2. Plaintiffs further assert that "[o]f the 37 plaintiffs in this consolidated case, only one (Del Mariani) has not installed protective revetments on their own property." Banks Pls.' Br. at 4–5. Plaintiffs point to "[t]he Corp[s'] publication and distribution of manuals on the protection of shoreline property from erosion on the Great Lakes" as evidence that the construction of protective structures is an accepted practice for landowners seeking to stem the erosion of their shoreline property. Stone Pls.' Resp. at 4.

Plaintiffs contend that "the Government is liable for the detrimental effects [that its activities] have had on plaintiffs' property" and ask this court to find the government liable for "any harm ... produced by residents' shore protection structures," which they ask this court to find to be the natural and probable result of the government's activities. Stone Pls.' Br. at 6. In support of their position, plaintiffs state, "None of the sea walls at issue would even exist if the Government had not caused the excessive erosion of the residents' property by starving

the region of sand." Id. at 2. Notwithstanding the suggestion by defendant in prior briefing that any erosion caused by plaintiffs' own efforts to mitigate damages by placing shore protection on their properties is not "chargeable" to the Corps, Defendant's Motion for Partial Summary Judgment as to the Period of Claim Examination and the High Water Mark at 12–14; see Banks IV, 68 Fed.Cl. 524, 535 (2005), plaintiffs note that "there is no evidence that has been made available to plaintiffs that any particular sea wall or structure constructed by individual landowners has materially contributed to the overall erosion experienced by any of the plaintiff property owners." Stone Pls.' Br. at 2; accord Banks Pls.' Resp. at 2 (stating that "[d]efendant[ ] ha[s] not alleged that plaintiff[s'] structures have caused erosion or that plaintiffs have done anything to interfere with the Michigan r[i]parian owner[s'] property interest in littoral sand naturally transported by wave-driven currents").

In further support of their assertions that the Corps caused the erosion that led plaintiffs to build protective structures on their properties, plaintiffs point to the two declarations attached as exhibits to Defendant's Memorandum in Support of Motion for Partial Summary Judgment as to the Erosion Caused by Plaintiffs' Shore Protection (Def.'s Mem.). Stone Pls.' Resp. at 4. The first is the declaration of defendant's expert Dr. Robert Nairn, a consultant with Baird & Associates, an engineering, science and planning firm with offices in Ontario, Canada and Madison, Wisconsin. Id. (citing Def.'s Mem., Ex.1 at 1, ¶ I). Dr. Nairn states in his declaration that "[i]n the period from 1946 to 1970, the sand trapped by the harbor, and otherwise lost as a result of the harbor, was not replaced by the Corps." Def.'s Mem., Ex.1 at 1, ¶ VI(e). Plaintiffs construe this statement as an "acknowledg[ment]" that sand began to be trapped in St. Joseph Harbor as a result of the jetties. See Stone Pls.' Resp. at 4 ("Dr. Nairn acknowledges that sand was being trapped in the harbor from,

---

**5.** Plaintiffs explain that the St. Joseph Harbor jetties interrupt the littoral drift by trapping sand. See Banks Pls.' Resp. at 1–2. According to plaintiffs, trapped or diverted sand reduces the

sand cover on the lake bed and permits the erosion, by water and wave action, of the subjacent support to plaintiffs' properties. Id.

at least, 1946 onward.... Dr. Nairn used [the 1946 date] as the date sand began to be trapped by the jetties....").

The second declaration to which plaintiffs refer is that of John Konik, the Chief of the Corps' Regulatory Office in the Detroit District.[6] Mr. Konik states that " '[t]he Detroit District ... examined the records regarding the granting of permits for the properties held by the individual plaintiffs [in this action]' and then discussed what that review disclosed." [7] Def.'s Mem., Ex. 2 at 24, ¶ 17; *see id.* at 24–30, ¶ ¶ 17(A)–17(KK). In his declaration, Mr. Konik set forth the date on which each plaintiff or that plaintiff's predecessor-in-interest received authorization from the Corps to erect a protective structure on a property at issue in this action, and he identified the year 1971 as the earliest date on which the Corps provided notice of authorization to a plaintiff or that plaintiff's predecessor-in-interest.[8] Def.'s Mem., Ex. 2 at 30, ¶ 17(GG). Based on the 1971 date of the Corps' first authorization for the construction of a protective structure by a plaintiff in this action, which date followed, according to Dr. Nairn's declaration, the twenty-four year period of time between 1946 to 1970 during which the Corps made no effort to mitigate the effect of the trapped sand in St. Joseph Harbor on the shoreline properties south of the harbor, *id.* at Ex. 1 at 1, ¶ IV(e), plaintiffs infer that the protective structures were built after, and as a result of, the trapping of sand by the jetties in St. Joseph Harbor. Stone Pls.' Resp. at 4–5.

Defendant contends that it "is not liable for any erosion caused by [p]laintiffs' or [n]on-[p]laintiff[ ] [t]hird [p]arties['] own efforts to mitigate erosion by placing shore protection on their respective properties." Def.'s Mem. at 11. Defendant asserts that, based on the Corps' mitigation efforts, "evidence at trial will show that the net erosion caused by the Corps is zero." *Id.* at 10. Defendant further asserts that "the erosion experienced by [p]laintiffs was caused by natural forces and other man-made structures constructed by private parties." *Id.*

Furthermore, pointing to language in plaintiffs' arguments that there would be no erosion "[b]ut for" the activities of the Corps in St. Joseph Harbor, defendant argues that this court lacks jurisdiction to hear plaintiffs' claims because those claims sound in tort. *See* Def.'s Mem. at 11–13 (citing 28 U.S.C. § 1491 and quoting, for example, Banks Pls.' Resp. at 6 ("*But for* the governmental jetties, there would not be a subtraction of sand from the littoral system.") (emphasis added) and Banks Pls.' Resp. at 19 ("There are no dams on the St. Joseph River that *but for* Federal legislation or permits could have been built in the first place, much less continue to exist.") (emphasis added)); *see also* Def.'s Reply at 2 (quoting language from plaintiffs' briefing indicating that construction of the shore protection, which plaintiffs allege caused additional damage, was the " 'direct and natural result of the Corps' construction of the jetties" and quoting "but for" language contained in the Banks plaintiffs' briefing to demonstrate that plaintiffs' claims

---

6. Mr. Konik explained in his declaration that "[t]he responsibilities of the Detroit District Regulatory Office include the processing of permit applications submitted under ... Section 10 of the Rivers and Harbors [Appropriation] Act of 1899 (RHA) ...." Def.'s Mem., Ex. 2 at 18, ¶ 2.

7. Mr. Konik states that the permit records also indicate that, between 1949 and 1986, the Corps "issu[ed] ... permits to the Michigan State Highway Department, the Michigan Department of Transportation, and the Chesapeake and Ohio Railway for shoreline protection work just south of St. Joseph [Harbor], Michigan." *Id.* at 30–31, ¶¶ 18(A)–18(I).

8. Mr. Konik identifies Ms. Grace Walsh as the recipient of the Corps' authorization for the installation of a protective structure, specifically,

"a bulkhead lakeward of ... existing wooden and steel bulkheads," on a *"[p]roject site includ[ing] property at 4660 Notre Dame Avenue now owned by plaintiff Michael Walsh."* *Id.* at 30, ¶ 17(GG). The parties have not addressed in their briefing the legal implication, if any, of the installation of protective structures by the predecessors-in-interest to the plaintiff property owners in this action.

Mr. Konik also states in his declaration that "[r]eview of the Corps['] files did not reveal any permit records for the Stone plaintiffs or for the 3742 Lakeshore Drive, St. Joseph, Michigan address[, the address listed for the Stone plaintiffs]." *Id.* at 30, ¶ 17(KK). The parties have not addressed in their briefing the legal implication, if any, of the absence of permit records for the Stone plaintiffs or for the property that the Stone plaintiffs allege has been taken.

sound in tort). Defendant asserts that "while 'a suit for a federal taking lies properly within the jurisdiction of the United States Claims Court, the court has no jurisdiction to entertain tort claims and would have to dismiss such a suit.' " Def.'s Mem. at 12 (quoting *Bagwell v. United States,* 21 Cl.Ct. 722, 726 (1990)).

More particularly to the revetments issue, defendant argues that plaintiffs "cannot satisfy the first part of the two-part analysis test for inverse condemnation claims established in *Ridge Line, Inc. v. United States,* 346 F.3d 1346, 1355–56 (Fed.Cir.2003)." Def.'s Mem. at 11. Defendant asserts that plaintiffs "cannot demonstrate that the erosion precipitated by [the] private revetments [was] the direct, natural or probable result of the Section 10 permitting process." *Id.; see also* Def.'s Reply at 2. "Nor can [p]laintiffs demonstrate that the Corps intended to invade a protected property interest." Def.'s Mem. at 11.

Because jurisdiction is a "threshold" issue, *see Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (reiterating the "requirement that jurisdiction be established as a threshold matter"), the court first considers whether plaintiffs have alleged takings or tort claims.

■ In *Ridge Line, Inc. v. United States,* the United States Court of Appeals for the Federal Circuit (Federal Circuit) specifically addressed the relationship between takings claims and tort claims, stating that " '[i]nverse condemnation law is tied to, and parallels, tort law.' " [9] 346 F.3d 1346, 1355 (Fed. Cir.2003) (quoting 9 Patrick J. Rohan & Melvin A. Reskin, *Nichols on Eminent Domain* § 34.03[1] (3d ed. 1980 & Supp.2002)). The Federal Circuit in *Ridge Line* set out a two-part test for "distinguishing potential takings from possible torts":

> First, a property loss compensable as a taking only results when the government intends to invade a protected property interest or the asserted invasion is the di-

rect, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action. Second, the nature and magnitude of the government action must be considered. [T]o constitute a taking, an invasion must appropriate a benefit to the government at the expense of the property owner, or at least preempt the owner[']s right to enjoy his property for an extended period of time, rather than merely inflict an injury that reduces its value.

*Ridge Line,* 346 F.3d at 1355–56 (quotations and citations omitted); *see also Moden v. United States,* 404 F.3d 1335, 1342 (2005) (reiterating the two-part analysis set out in *Ridge Line*).

· ■ At issue in this action is the first prong of the two-part test: whether plaintiffs' erosion damage, if proven, may properly be categorized as "the direct, natural, or probable result" of the Corps' activities in St. Joseph Harbor and, of particular interest in this briefing, whether any of plaintiffs' erosion damage attributable to the revetments that plaintiffs constructed to mitigate their erosion damage may also be categorized as "the direct, natural, or probable result" of the Corps' activities in St. Joseph Harbor. In *Moden,* the Federal Circuit explained that the "direct, natural, or probable result standard" articulated in *Ridge Line* requires not only proof of causation—that the government act was the likely cause of the injury—but also proof "that the government should have predicted or foreseen the resulting injury"— that the injury was the likely result of the government act. 404 F.3d at 1343. The Federal Circuit advised in *Moden* that "injury may not be foreseeable if an intervening cause breaks the chain of causation." *Id.* at 1344.

To establish a takings claim here, plaintiffs must show that the erosion damage to their shoreline properties was "the direct, natural, or probable result of the [Corps' activities in St. Joseph Harbor], rather than merely an

---

9. In *Moden v. United States,* the Federal Circuit defined "inverse condemnation" as a " 'shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted.' " 404 F.3d 1335, 1342 (2005) (quoting *United States v. Clarke,* 445 U.S. 253, 257, 100 S.Ct. 1127, 63 L.Ed.2d 373 (1980)).

incidental or consequential injury." *Ridge Line,* 346 F.3d at 1356. In particular, plaintiffs must show that the Corps' activities in St. Joseph Harbor were the likely cause of the erosion of their shoreline property and that the resulting erosion damage was foreseeable. Plaintiffs must also show that any erosion allegedly caused by plaintiffs' revetments was a foreseeable injury resulting from the Corps' activities and not "an intervening cause" of injury. *See Moden,* 404 F.3d at 1342–44.

Plaintiffs assert that they built revetments to mitigate the erosion damage caused by the Corps' activities in St. Joseph Harbor. *See* Banks Pls.' Br. at 9 ("The Corps is liable for all erosion. Shore parallel sea[ ]walls and groins are made necessary by the sand deficit which the [Detroit District Corps] has caused."); Banks Pls.' Resp. at 2 ("[T]here [was] no need for sea walls or other shore protection until the [St. Joseph Harbor] jetties [constructed and maintained by the Corps'] trap[ped] or divert[ed] sufficient sand to expose the lakebed [and] thereby remov[e] the subjacent support to plaintiffs' properties."); Stone Pls.' Br. at 1 ("All of the protective structures in question were built as a direct result of the severe erosion caused by the Government's construction and maintenance of the St. Joseph Harbor jetties . . . ."); Stone Pls.' Resp. at 2 (asserting that the "protective structures . . . exist . . . because of and as a result of the government's actions in blockading sand at St. Joseph Harbor"). The Corps acknowledges that "shore protection has been installed for approximately 70 percent of the coast in the St. Joseph Township located south of the St. Joseph Harbor on Lake Michigan." Def.'s Mem. at 6. Defendant states that, by permit application, "[s]hore protection has been installed for most of the properties owned by plaintiffs" and that shore protection also has been installed for properties used by nonplaintiffs, including the Chesapeake & Ohio Railroad Company, the Michigan Department of Transportation, and the Michigan State Highway Department. *Id.*

Defendant contends that "[t]he shore protection installed along the coast of Lake Michigan south of St. Joseph Harbor interferes with the littoral transport of sand and causes erosion downdrift." Def.'s Mem. at 7. Although the Corps concedes that it has issued public information describing "design and construction techniques" for private shoreline protection that reflected "science and understanding at the time," it asserts that "over the last century, . . . the Corps [has] de-emphasiz[ed] the construction of private shoreline protective structures and [has] suggest[ed] other, more environmentally[-]sound alternatives." *Id.* Plaintiffs point out that "no evidence has been made available to plaintiffs that any particular sea wall or structure constructed by individual landowners has materially contributed to the overall erosion experienced by any of the plaintiff property owners." Stone Pls.' Br. at 2; *see also* Banks Pls.' Resp. at 2 (asserting that "[d]efendant[ ] ha[s] not alleged that plaintiff[s'] structures have caused erosion"). If, however, there is any erosion caused by the revetments, plaintiffs argue that the Corps is responsible for it because the need to construct the revetments was a direct result of the Corps' activities in St. Joseph Harbor. *See, e.g.,* Stone Pls.' Br. at 1.

Although the parties dispute whether the Corps is liable for any of plaintiffs' erosion damage and whether revetments have caused any erosion, the parties do not dispute that the Corps issued permits authorizing the construction of the protective structures. The parties dispute the legal effect of the Corps' issuance of the permits for the revetments.

The regulation setting forth the general policies for evaluating permit applications provides: "Because a landowner has the general right to protect property from erosion, applications to erect protective structures will usually receive favorable consideration." 33 C.F.R. § 320.4(g)(2) (2005). The possibility that "[a] protective structure may cause damage to the property of others" is specifically identified as a factor that the Corps must consider when evaluating permit applications for the construction of protective structures. *See id.* (providing that "if the protective structure may cause damage to the property of others, . . . the [Corps'] district engineer will so advise the applicant and

inform him of possible alternative methods of protecting his property"). The fact that the regulation governing the permitting of protective structures addresses the potential for the protective structures to cause damage to the property of others contemplates the possibility that protective structures erected to protect property from erosion damage may indeed cause damage to property. The consideration of potential damage to the property of others during the permitting process supports the conclusion that property damage that results from the presence of protective structures on private property is a foreseeable injury.

To the extent that plaintiffs can establish at trial that the jetties in St. Joseph Harbor caused erosion damage to their shoreline and that plaintiffs' revetments were installed to address the erosion caused by the Corps, the court concludes that any further erosion caused by the protective structures is properly viewed as a "direct, natural, or probable result" of the activities of the Corps in St. Joseph Harbor. *See Ridge Line*, 346 F.3d at 1355; *Moden*, 404 F.3d at 1342–44; *see also Georgia–Pacific Corp. v. United States*, 226 Ct.Cl. 95, 640 F.2d 328, 360–61 (1980) ("It is settled that not all losses suffered by the owner are compensable under the fifth amendment.... Under federal law, there can be no recovery for consequential damages as a result of a taking.") (citations and footnote omitted). The court finds that, under the first prong of the *Ridge Line* two-part test, plaintiffs' claim is properly classified as a taking and proven damages, attributable to plaintiffs' revetments, could be included within any damages proven to have been caused by the Corps' activities in St. Joseph Harbor.

The second prong of the *Ridge Line* two-part test for "distinguishing potential physical takings from possible torts" considers "the nature and magnitude of the government action." *Ridge Line*, 346 F.3d at 1355–56. Specifically, "an invasion must ... preempt the owner['s] right to enjoy his property for an extended period of time, rather than merely inflict an injury that reduces its value." *Id.* at 1356. Here, plaintiffs allege that their property—located di-

rectly on the coastline—has been receding for many years and continues to recede at the rate of two feet per year. Banks Pls.' Compl. ¶¶ 3, 26, 30–31. Thus, plaintiffs do not allege an "injury that [has merely] reduce[d the] value" of their property; rather, plaintiffs allege a "preempt[ion of their] right to enjoy [their] property for an extended period of time." Accordingly, the "nature and magnitude" of the alleged erosion, if proved, would support the classification of this claim as a taking.

Defendant's argument that the use of "but for" language in plaintiffs' briefing demonstrates that plaintiffs' claims sound in tort must fail. Defendant's position, when considered in light of the facts of this case, is contrary to the Federal Circuit's guidance in *Ridge Line* and in *Moden*. The court's conclusion that plaintiffs have alleged a taking does not, however, prove that a taking has occurred. The burden remains with the plaintiffs to present evidence to prove their case at trial.

C. Whether Section 10 of the River and Harbor Act of 1899 Shields the Corps from Potential Liability for Erosion Attributable to Plaintiffs' Shore Protection

Defendant contends that "[e]ven assuming the Corps caused some of the erosion [p]laintiffs were responding to when they constructed revetments, and even if the Corps issued permits for [p]laintiffs' revetments, as a matter of law[,] the Corps is not liable for the resulting erosion." *Id.* at 10. Defendant states that the Corps is authorized to issue permits "[p]ursuant to Section 10 of the Rivers and Harbors [Appropriation] Act of 1899" to property owners "who desire to place shore protection" on their property, *id.* at 3 (citing Def.'s Mem., Ex. 2 at 18–19 (declaration of Mr. Konik)) and asserts that the Corps cannot be held responsible for damages caused by "authorized structures" under the "Section 10 permitting process," Def.'s Mem. at 11. In support of its argument, defendant points to language in the Section 10 permit that states:

In issuing this permit, the Federal Government does *not* assume any liability for ...

[d]amages to persons, property, or to other permitted or unpermitted activities or structures caused by the activity authorized by this permit.

*Id.* at 13–14 (quoting 33 C.F.R. pt. 325, App. A (Permit Form and Special Conditions) (2005) (emphasis added by defendant)).

The general framework for analyzing whether defendant is liable for any erosion which the revetments caused or to which the revetments contributed is provided, the court believes, by *United States v. Dickinson,* 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947). In *Dickinson,* the Court affirmed an award of compensation to two individual property owners for the flowage easements taken by the government's permanent flooding of their land and for the erosion damage caused by the raised river levels resulting from the government's dam construction. 331 U.S. at 746–47, 751, 67 S.Ct. 1382. The award of damages for the erosion was "based on the cost of protective measures which the landowners might have taken to prevent the loss." *Id.* at 747, 67 S.Ct. 1382. Rejecting the argument that the erosion damage was "consequential," the Supreme Court stated:

Of course, payment need only be made for what is taken, but for all that the Government takes it must pay. When it takes property by flooding, it takes the land which it permanently floods as well as that which inevitably washes away as a result of that flooding. The mere fact that all the United States needs and physically appropriates is the land up to the new level of the river, does not determine what in nature it has taken. If the Government cannot take the acreage it wants without also washing away more, that more becomes part of the taking.

*Id.* at 750, 67 S.Ct. 1382.

It is established that the cost of constructing protective structures to prevent erosion damage is compensable in a takings action. *See id.* at 747, 67 S.Ct. 1382 (affirming an award of damages "based on the cost of protective measures which the landowners might have taken to prevent the loss"). Moreover, erosion damage to property that results from the presence of protective structures on private property is a foreseeable injury. The foreseeability of such injury is explicitly recognized in the regulation identifying factors that the Corps must consider when evaluating permit applications for the construction of protective structures. *See* 33 C.F.R. § 320.4(g)(2) (2005) (providing that "if the protective structure may cause damage to the property of others, ... the [Corps'] district engineer will so advise the applicant and inform him of possible alternative methods of protecting his property").

Defendant here asserts that it cannot be liable for "[t]he erosion caused by subsequently and independently constructed revetments" because that erosion "is not part of the *same physical process* that caused the initial erosion." Def.'s Reply at 10. Defendant argues that it is not enough that the damages caused by the revetments resulted from "one event [that] preceded the other, or that one event may have been related to another." *Id.* The court disagrees.

As the Supreme Court explained in *Dickinson,* "[w]hen [the government] takes property by flooding, it takes the land which it permanently floods as well as that which inevitably washes away as a result of that flooding." 331 U.S. at 750, 67 S.Ct. 1382. Accordingly, the Supreme Court affirmed, as part of the takings compensation, the damage award for the erosion caused by the flooding that resulted from the government's dam construction. *Id.* at 746–47, 67 S.Ct. 1382. Applying to the facts of this case the reasoning of *Dickinson* that erosion damage that results from flooding caused by an authorized governmental act is compensable, the court determines that, if the government has taken property by erosion, it can be found to have taken the land which it permanently erodes as well as the land that inevitably erodes as a result of that erosion. It is the view of the court that "the land ... [that] inevitably washes away" could include, in the circumstances of this case, the land that eroded as a result of the approved practice of erecting protective structures on private property in an effort to mitigate erosion shown to have been caused by defendant's trapping of sand at St. Joseph Harbor, so that erosion damage caused by the protective structures is potentially compensable.

■ Defendant argues that Section 10 of the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 403 (2000) (River and Harbor Act of 1899 or RHA), relieves the United States of liability that it would otherwise appear to have under *Dickinson.* The court does not discern that the RHA would provide the shield defendant claims. Under Section 10 of the RHA, a permit is required to build a revetment or other structure in navigable waters of the United States:

The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army. . . .

33 U.S.C. § 403 (2000). The Corps issues many permits under Section 10. As Mr. Konik, the Chief of the Corps Regulatory Office in the Detroit District, states in his declaration:

[T]he most frequently exercised authority [in the Detroit District] is contained in Section 10 (33 U.S.C. § 403), which regulates construction, excavation, or deposition of materials in, over, or under navigable waters, or any work that would affect the course, location, condition, or capacity of such waters. This authority has been granted to the Secretary of the Army, acting under the Chief of Engineers for the U.S. Army Corps of Engineers, since enactment of the RHA.

Def.'s Mem., Ex. 2 at 18, ¶ 3. Mr. Konik further states that "the basic form of authorization used by Corps districts [in the current Corps regulatory program] is the individual permit, which involves the evaluation of individual, project[-]specific applications." *Id.* at 20, ¶ 7.

Section 320.4 of Title 33 of the Code of Federal Regulations outlines the "[g]eneral policies for evaluating permit applications." 33 C.F.R. § 320.4 (2005). Subsection 320.4(g)(2) of the regulation provides:

Because a landowner has the general right to protect property from erosion, applications to erect protective structures will usually receive favorable consideration. However, if the protective structure may cause damage to the property of others, adversely affect public health and safety, adversely impact floodplain or wetland values, or otherwise appears contrary to the public interest, the district engineer will so advise the applicant and inform him of possible alternative methods of protecting his property. Such advice will be given in terms of general guidance only so as not to compete with private engineering firms nor require undue use of government resources.

*Id.* § 320.4(g)(2). Subsection 320.4(g)(6) of the regulation states that "a [Department of Army] permit does not authorize any injury to property or invasion of rights or any infringement of Federal, state or local laws or regulations." *Id.* § 320.4(g)(6). The permit application form imposes, under the heading "Further Information," the limitation on federal liability on which defendant relies here: "In issuing this permit, the Federal Government does not assume any liability for … [d]amages to persons, property, or to other permitted or unpermitted activities or structures caused by the activity authorized by this permit." 33 C.F.R. pt. 325, App. A(3) (2005) (Permit Form and Special Conditions); *see* Def.'s Mem. at 13–14.

In interpreting the limitation on federal liability set forth in the Permit Form and Special Conditions, the court first looks to the plain language of the limitation, as the canons of statutory and regulatory interpretation require. *See* 2A Norman J. Singer, *Sutherland Statutory Construction* § 46:01 (6th ed.2000); *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980) ("[T]he starting point for interpreting a statute is the language of the statute itself."); *Greyhound Corp. v. Mt. Hood Stages, Inc.,* 437 U.S. 322, 330, 98 S.Ct. 2370, 57 L.Ed.2d 239 (1978) ("the starting point in every case

involving construction of a statute is the language itself" (internal quotations and citation omitted)). The limitation of the government's liability in "[i]ssuing [a Section 10] permit" on which defendant relies is the statement that "the Federal Government does not assume any liability for the ... [d]amages ... caused by the activity authorized by this permit." Permit Form and Special Conditions. But it is not legally relevant here whether defendant "assume[s]" liability or not. Under *Dickinson*, defendant is liable for all that has been taken as a result of its activities; there is no liability for the government to "assume." Nothing in the Permit Form operates to remove the liability. Nor is it relevant that the permit "does not authorize any injury to property." 33 C.F.R. § 320.4(g)(6). If the Corps' activities in St. Joseph Harbor were proven to have caused erosion damage to plaintiffs' properties and the installation of plaintiffs' shoreline protection resulted from that erosion, the injury to plaintiffs' properties would be a foreseeable result of the Corps' activities and the question of "authoriz[ation]" would be beside the point. The government looks to its Section 10 permit for protection from liability which the court finds that the permit does not afford.

## III. Conclusion

Based on the foregoing, the court determines the following:

(1) The Banks Plaintiffs' Motion to Take Judicial Notice of the Michigan Supreme Court Ruling on July 29, 2005 in *Glass v. Goeckel* [,] Docket No. 126409 is DENIED.

(2) The arguments in defendant's briefing that plaintiffs have stated a claim for a tort and not a taking are construed as a motion to dismiss and such motion is DENIED.

(3) To the extent that plaintiffs can establish at trial that the jetties in St. Joseph Harbor caused their erosion damage and that plaintiffs' revetments were constructed to address erosion damage so caused, the court finds that erosion damage caused by the revetments would not be merely consequential but rather a "direct, natural, or probable result" of the activities of the Corps compensable as part of plaintiffs' taking claim.

(4) The limitation of liability language in the permit application form for authorization to construct a protective structure does not shield the Corps from liability for damages that are the "direct, natural, or probable result" of the Corps' activities.

IT IS SO ORDERED.