John Gardner BLACK, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 07–850 C.

United States Court of Federal Claims.

Oct. 23, 2008.

**440**

John Gardner Black, Warriors Mark, Pennsylvania, pro se.

Michael James Dierberg, United States Department of Justice, Washington, D.C., for defendant.

## OPINION AND ORDER

SWEENEY, Judge.

Before the court is Defendant's Motion to Dismiss. In this action, plaintiff John Gardner Black, proceeding *pro se*, alleges that defendant, by and through the Securities and Exchange Commission ("SEC"), obtained an indictment on allegations that plaintiff and his companies committed securities violations based upon an incorrect market value of investment contracts and thereby effectuated a taking of property without just compensation in violation of the Fifth Amendment to the United States Constitution. Defendant moves to dismiss plaintiff's complaint pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"). Specifically, defendant maintains that this court lacks jurisdiction to adjudicate plaintiff's claim, which it asserts is brought under the guise of a takings claim but actually represents a collateral attack upon a civil enforcement action brought against him in federal district court. Furthermore, defendant argues that plaintiff's claim is untimely and is therefore barred by the court's six-year statute of limitations. For the reasons set forth below, defendant's motion is granted.

## I. FACTUAL BACKGROUND[1]

Plaintiff was the chief executive officer and sole shareholder of Devon Capital Man-

---

**1.** Plaintiff's complaint does not contain a full recitation of the underlying facts that form the basis of his action. Therefore, the facts are de- rived from the complaint, the parties' briefs, exhibits accompanying plaintiffs' briefs, and ap-

agement, Inc. ("Devon"), a registered management adviser that provided investment advisory services to local government units, primary school districts in Pennsylvania and other states, and non-profit organizations.[2] Def.'s App. 1 at 2. In addition, plaintiff was an officer, then a majority shareholder, and ultimately the sole shareholder of Financial Management Sciences, Inc. ("FMS"), a Pennsylvania corporation that, beginning in 1994, was in the "exclusive business of investing funds of Devon clients" pursuant to a contract between Devon and FMS called a Collateralized Investment Agreement ("CIA"). *Id.* at 3. Beginning in May 1994, plaintiff invested client funds using CIAs, with FMS as a guarantor of a specified rate of return to the client. *Id.* at 7. Plaintiff's clients were not signatories to the CIAs. *Id.* Pursuant to these CIAs, FMS "represented that it would secure or collateralize the investments of the client with securities having a fair market value equal to or greater than 100% of the clients' investments in the CIA program."[3] *Id.* (footnote omitted).

In 1994, the Federal Reserve Board initiated a series of increases in short-term interest rates. *Id.* at 9. Consequently, all fixed-rate securities, including securities deposited as collateral for the investments of client-beneficiaries of the CIAs, sustained losses that reduced the fair market value of the collateral assets below the monies that "would have been owed to client beneficiaries of CIA[s] had they requested their monies at approximately the same time." *Id.* The "shortfall between the face amount of the CIA and the liquidation value of assets persisted" from 1994 until September 1997,

when plaintiff's businesses were placed in trusteeship by the United States District Court for the Western District of Pennsylvania ("Western District of Pennsylvania" or "district court"). *Id.* at 10. In September 1997, this shortfall totaled $61.3 million.[4] *Id.*

Between 1994 and 1996, plaintiff utilized collateralized mortgage obligations ("CMOs") as collateral for his CIA clients. *Id.* Beginning in 1996, in response to a letter issued by the Pennsylvania Auditor General expressing "grave concerns about investments by school districts in CMO[s]," numerous Devon clients inquired as to whether their funds were invested in CMOs. *Id.* at 11. Devon's responses to these inquiries failed to disclose that client funds had been invested in CMOs. *Id.* Additionally, plaintiff "failed to mark [CMOs] to the liquidation value as promised in the [CIA] and in solicitation materials." *Id.* Several school district auditors began requesting reports of the collateral being applied to CIA client accounts at the end of each school year. *Id.* The reports plaintiff furnished, however, did not mark CMOs to the liquidation value as stipulated in the CIAs and solicitation materials. *Id.* at 11–12. Consequently, these reports concealed the shortfall in the collateral account. *Id.* at 12; *supra* note 4.

In January 1996, plaintiff purchased a CMO inverse floater for approximately $14,130,000.00 plus accrued interest, representing 1,088,000 shares at an average price of $14.37 per share. Def.'s App. 1 at 12. Throughout 1996, plaintiff "directed the preparation of ... internal collateral report[s] used by FMS," which gradually in-

---

pendices accompanying defendant's motion to dismiss.

**2.** Devon was a subchapter S corporation incorporated in Maryland and registered with the SEC as an investment advisor. Def.'s App. 1 at 2. Plaintiff became Devon's sole shareholder in 1993, *id.*, and "ma[de] all investment decisions for Devon," Pl.'s Sur-Reply Ex. 1 at 4.

**3.** Devon employed a sales force to market its investment advisory services. Def.'s App. at 8. The sales force generated solicitation and marketing materials, which "ensured the safety of investments," *id.*, indicated that Devon would guarantee or assure no loss of the client's princi-

pal, and reiterated that "collateral would be maintained at 100% of the fair market value of the client's outstanding investment," *id.* at 8–9. These materials also "set forth rates of return, and the fees to be charged to the prospective client's account," and stated that clients' funds would not be pooled. *Id.* at 8.

**4.** Despite the fact that plaintiff furnished his clients and prospective clients "numerous mailings," which included proposal letters, investment advisory agreements, monthly statements, and end-of-the-year collateral reports, none of the reports issued over a period of two and one-half years disclosed the shortfall. Def.'s App. 1 at 10.

creased the inverse floater values. *Id.* For example, in February 1996, plaintiff valued the inverse floater at a price of $34.00 per share. *Id.* In May 1996, that price was increased to $35.00 per share. *Id.* In August 1996, the price was increased to $43.20 per share and, in November 1996, the price was further increased to $96.50 per share. *Id.* As a result, end-of-the-year reports understated the number of shares in the inverse floater, which was allocated as collateral to the accounts of clients. *Id.* at 12–13. This was apparently achieved through "the preparation of multiple internal collateral reports which allocated the [inverse floater] in higher proportion to clients who either had already received collateral reports or had not requested collateral reports." *Id.* at 13. By September 1997, Devon clients holding CIAs had outstanding investments of $233,000,000.00. *Id.; accord* Compl. ¶ 2 ("The market value of the CIAs determined pursuant to federal regulations on September 26, 1997[,] was approximately $233 million.").

"Under the correct fair market valuation of the [inverse floater], the assets of FMS and those held by it as collateral for the CIA[s] of Devon clients in or around September 1997 amounted only to approximately $164,000,000.00, and approximately $7,000,000.00 of FMS assets." Def.'s App. 1 at 13; *accord* Compl. ¶ 11 (indicating that the United States stipulated that pooled assets in FMS amounted to $164 million and that there were $7 million of FMS assets). Plaintiff, however, asserts that the "market value of the CIAs determined in accordance with generally accepted accounting principals [sic] and pursuant to case law … was approximately $269 million on September 26, 1997." Compl. ¶ 3. According to plaintiff, the CIAs

worth $269 million "were sold from FMS to Plaintiff's customers … for $233 million pursuant to an agreement that the CIAs would be resold to … FMS[ ] for the amount of $233 million according to a schedule publicly distributed [to] Plaintiff's customers and pursuant to published federal regulations." *Id.* ¶ 4. Thus, plaintiff alleges that defendant took and rendered valueless "a present value net worth surplus of $36 million … [from] Plaintiff's company FMS, in addition to the $7 million book value net worth of the company." *Id.* ¶ 5. According to defendant, the United States Court of Appeals for the Third Circuit ("Third Circuit") described plaintiff's action as constituting part of a Ponzi scheme. Def.'s Mot. Dismiss ("Def.'s Mot.") 2 (citing *Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*, 189 F.3d 321, 323–25 (3d Cir.1999)). *But see* Pl.'s Resp. Def.'s Mot. ("Pl.'s Resp.") 2 (denying "adamantly" that plaintiff operated a Ponzi scheme, noting that plaintiff was not a party in *Bald Eagle Area School District*, and arguing that the "financial opinion expressed by Judge McKee is not supported by the facts and is inconsistent with existing Arbitrage Regulations and standard security valuation"[5]).

In August 1997, the SEC investigated Devon and discovered that it was "carrying assets on its books at materially inflated values and had incurred massive trading losses totaling at least $50 million of the $345 million entrusted to it by its investment clients." Def.'s Mot. 1; *accord* Pl.'s Resp. Ex. 6 at 2 (containing the Third Circuit's opinion in *SEC v. Black*, 262 Fed.Appx. 360, 361, 363 (3d Cir.2008), affirming the denial of plaintiff's Rule 60(b) of the Federal Rules of Civil Procedure motion and stating that the

5. The court need not address plaintiff's quarrel with the Third Circuit's characterization of his actions as constituting a Ponzi scheme; however, the court will take judicial notice of the Third Circuit's decision in *Bald Eagle Area School District. See* Fed.R.Evid. 201(a)-(b). Moreover, the court further notes that although plaintiff was not individually named as a defendant in *Bald Eagle Area School District,* he and his companies, Devon and FMS, were discussed in the court's decision:

Various school districts, municipalities[,] and other government units were purported victims of a Ponzi scheme run by John Gardner Black

through his companies: Devon … and [FMS]. The various local government units appointed Devon to act as their investment advisor for the proceeds of bonds, loans[,] and other revenues. On September 26, 1997, the [SEC] obtained a freeze on all assets under the control of Devon…. Certain of the investors then began an involuntary bankruptcy action against Black, Devon[,] and FMS[,] and that action has halted any other litigation in which Black, Devon[,] and FMS were named as defendants.

*Bald Eagle Area Sch. Dist.,* 189 F.3d at 323–24 (footnotes omitted).

SEC "determined that Devon had assets at materially inflated values"). The SEC's investigation concluded that plaintiff and Devon concealed those losses from their clients and continued to accept funds from new clients without disclosing the losses. Def.'s Mot. 1–2. In September 1997, the SEC instituted a civil action against plaintiff, Devon, and FMS in the Western District of Pennsylvania. Id. at 1–2; Pl.'s SurReply Ex. 1 (containing the SEC's September 26, 1997 complaint against plaintiff); Compl. ¶ 8 (stating that the SEC alleged that "[p]laintiff and his companies had committed securities violations by not maintaining liquid assets equal to or exceeding the market value of the CIAs owned by the Clients"). But see Compl. ¶ 9 (alleging that the SEC claimed that "the forced liquidation of a single investment ... was worth substantially less than the value Plaintiff calculated" and maintaining that the SEC "did not state the valuation of the remaining investments or the federally regulated value of the CIAs, even though Federal Regulations require that the present value of all expected cash flows be utilized in calculating the value of investments").

During the course of the SEC's civil action against plaintiff, the district court froze the assets of plaintiff, Devon, and FMS, and appointed a trustee for the assets. Def.'s Mot. 2. It subsequently entered a permanent injunction, issued an order of disgorgement, and imposed civil penalties against plaintiff. Id.; Def.'s Reply Br. Supp. Mot. ("Def.'s Reply") 1. Plaintiff appealed to the Third Circuit, which denied his motion to set aside the judgment. Def.'s Reply 2; Black, 262 Fed.Appx. at 363.

The United States also instituted a criminal action against plaintiff, Def.'s Mot. 2, indicting him on seventy-eight counts of fraud by an investment advisor, nine counts of mail fraud, thirty-four counts of making a false statement, and thirteen counts of engaging in monetary transactions in property derived from specified unlawful activity. Def.'s App. 1 at 1. In the criminal case, the United States indicated that the market val-

ue of the CIAs was "irrelevant to any issues remaining ... with respect to the payment, but not the amount, of restitution owed." Pl.'s Resp. Ex. 3 at 2. In 2000, plaintiff pled guilty to twenty-one counts of investment advisor fraud, three counts of mail fraud, and two counts of making false statements. Def.'s App. 1 at 15–16. He was sentenced to forty-one months imprisonment with three years supervised release, Pl.'s Resp. Ex. 6 at 2 n. 1, and was ordered to pay restitution in the amount of $61,300,000, Def.'s Mot. 2. In June 2007, the Third Circuit denied plaintiff's appeal to set aside his indictment. Compl. ¶ 16; see also Pl.'s Resp. Ex. 7 at 4–5 (containing the Third Circuit's order denying plaintiff's request for a certificate of appealability, construing plaintiff's motion as one filed under 28 U.S.C. § 2255 (2000), stating that plaintiff's first section 2255 motion was denied on the merits in 2001, and indicating that plaintiff's motion constituted a second or successive section 2255 motion).

In this action, instituted on December 3, 2007,[6] plaintiff seeks to recover the value of Devon and FMS, which plaintiff claims defendant took "under the color of law [and] in violation of the Fifth Amendment to the [U.S.] Constitution." Pl.'s Sur–Reply 1. Plaintiff alleges that he moved the district court to amend the indictment by removing the charge of misrepresentation of the market value of the CIA. Compl. ¶ 12. According to plaintiff, the district court granted his motion, "thereby preventing litigation of that fact." Id. Plaintiff further maintains that the district court "entered an order in which it held that the market value of the CIA 'had been litigated and resolved,'" Pl.'s Resp. 4, though he alleges that this "was done without Plaintiff's or his then attorney's knowledge," Compl. ¶ 13; see also Pl.'s Resp. 2 (arguing that plaintiff never entered a guilty plea for misrepresenting the market value of the CIA and stating that he "[n]ever spent a day in prison for misrepresenting the market value of the CIA"); Pl.'s Resp. Ex. 5 (containing letters from plaintiff's previous counsel indicating that the market value of the CIAs was not litigated or determined during their re-

6. Although plaintiff asserts that he filed this action on November 29, 2007, the date that appears on the signature page of plaintiff's com-

plaint, see Compl. 7, the complaint was actually received and filed by the Clerk of Court on December 3, 2007.

spective representations of plaintiff). *But see* Pl.'s Resp. Ex. 1 (containing an October 5, 2005 district court order stating that the SEC complaint against plaintiff "did not allege that he falsely represented the market value of the CIAs to his clients," indicating that neither plaintiff nor the SEC "had litigated the market value of the CIAs," scheduling a hearing "to determine the market value of the CIAs issued by the common enterprise" to determine the value of FMS and Devon, but containing a handwritten postscript from the court dated December 13, 2005, stating that "the issue presented in the Motion to Hold Hearing has been previously litigated and resolved").

Plaintiff contends that "the Government, on at least three prior occasions, did not dispute that the value of the CIA was $269 million, valued pursuant to fair market value based upon a reasonable expectation of profits." Pl.'s Resp. 4. Plaintiff further alleges that he presented, in both October and December 2006, unopposed motions to the district court indicating that the CIAs were worth $233 million pursuant to federal regulations and $269 million at fair market value. Compl. ¶ 14. The SEC, plaintiff claims, stated in a brief filed with the Third Circuit that it neither valued the CIAs nor used the published federal regulations setting forth the methods plaintiff used to value and report these assets. *Id.* ¶ 15; *see also id.* ¶ 1 (stating that the SEC "admitted that neither it nor the Department of Justice had followed published federal regulations issued by the Internal Revenue Service ... in valuing the assets" of FMS or the CIAs "owned by the customers of Plaintiff"). According to plaintiff, defendant "has concealed and continues to conceal the market value of the investment contract owned by the customers of Plaintiff's corporations." Pl.'s Sur–Reply 1.

Plaintiff alleges that at no time did defendant, the district court, or the Third Circuit "dispute[ ] that the market value of the CIAs was $269 million." Compl. ¶ 16. Plaintiff seeks $44 million in damages: $7 million for the book value of FMS; $36 million for the surplus of the contracts between FMS and plaintiff's clients valued as of September 26, 1997; and $1 million for the value of Devon

as of September 26, 1997. Compl. Prayer for Relief. Plaintiff also requests that the court "enter an order of collateral estoppel to prevent the Government from denying that the market value of the CIA was less than $269 million, a value it has not denied in at least four prior judicial proceedings, including the current Motion to Dismiss." Pl.'s Resp. 8.

## II. JURISDICTION

### A. *Pro Se* Plaintiff

The United States Court of Federal Claims ("Court of Federal Claims") holds pleadings of a *pro se* plaintiff to less stringent standards than litigants represented by counsel. *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). Courts have "strained [their] proper role in adversary proceedings to the limit, searching ... to see if plaintiff has a cause of action somewhere displayed." *Ruderer v. United States*, 188 Ct.Cl. 456, 412 F.2d 1285, 1292 (1969). Although plaintiff's pleadings are held to a less stringent standard, such leniency "with respect to mere formalities does not relieve the burden to meet jurisdictional requirements." *Minehan v. United States*, 75 Fed.Cl. 249, 253 (2007); *see also Kelley v. Sec'y, U.S. Dep't of Labor*, 812 F.2d 1378, 1380 (Fed.Cir.1987) ("[A] court may not similarly take a liberal view of that jurisdictional requirement and set a different rule for *pro se* litigants only."); *Bernard v. United States*, 59 Fed.Cl. 497, 499 (noting that *pro se* plaintiffs are not excused from satisfying jurisdictional requirements), *aff'd*, 98 Fed. Appx. 860 (Fed.Cir.2004). As the Court of Federal Claims stated in *Demes v. United States*, "[w]hile a court should be receptive to *pro se* plaintiffs and assist them, justice is ill-served when a jurist crosses the line from finder of fact to advocate." 52 Fed.Cl. 365, 369 (2002).

### B. Standard of Review

Subject matter jurisdiction is "an inflexible matter that must be considered before proceeding to evaluate the merits of a case." *Matthews v. United States*, 72 Fed.Cl. 274, 278 (2006). Subject matter jurisdiction may be challenged at any time by the parties, by

the court *sua sponte*, or on appeal. *Folden v. United States*, 379 F.3d 1344, 1354 (Fed. Cir.2004), *cert. denied*, 545 U.S. 1127, 125 S.Ct. 2935, 162 L.Ed.2d 865 (2005). When considering an RCFC 12(b)(1) motion, the burden of establishing the court's subject matter jurisdiction resides with the party seeking to invoke it. *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936). The court "consider[s] the facts alleged in the complaint to be true and correct." *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed.Cir.1988); *see also Henke v. United States*, 60 F.3d 795, 797 (Fed.Cir. 1995) (recognizing the court's obligation to "assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor").

A plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence, *Reynolds*, 846 F.2d at 748, and needs only to set forth a *prima facie* showing of jurisdictional facts to survive a motion to dismiss, *Raymark Indus., Inc. v. United States*, 15 Cl.Ct. 334, 338 (1988). Where a defendant or the court challenges jurisdiction, "the plaintiff cannot rely merely on allegations in the complaint, but must instead bring forth relevant, competent proof to establish jurisdiction." *Murphy v. United States*, 69 Fed.Cl. 593, 600 (2006). The court may consider matters outside the pleadings when examining jurisdiction. *Cedars–Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583–84 (Fed.Cir.1993); *see also Reynolds*, 846 F.2d at 748 ("If a motion to dismiss for lack of subject matter jurisdiction ... challenges the truth of the jurisdictional facts alleged in the complaint, the district court may consider relevant evidence in order to resolve the factual dispute."). If the court finds that it lacks subject matter jurisdiction, then it must dismiss the claim. *Matthews*, 72 Fed.Cl. at 278; RCFC 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.").

### C. The Tucker Act

The Court of Federal Claims is a court of limited jurisdiction. *Jentoft v. United States*, 450 F.3d 1342, 1349 (Fed.Cir.2006) (citing *United States v. King*, 395 U.S. 1, 3, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969)). As such, the scope of this court's jurisdiction to entertain claims and grant relief depends upon the extent to which the United States has waived its sovereign immunity. *King*, 395 U.S. at 4, 89 S.Ct. 1501. In "construing a statute waiving the sovereign immunity of the United States, great care must be taken not to expand liability beyond that which was explicitly consented to by Congress." *Fid. Constr. Co. v. United States*, 700 F.2d 1379, 1387 (Fed.Cir.1983). A waiver of sovereign immunity "cannot be implied but must be unequivocally expressed." *King*, 395 U.S. at 4, 89 S.Ct. 1501. Unless Congress consents to a cause of action against the United States, "there is no jurisdiction in the Court of Claims more than in any other court to entertain suits against the United States." *United States v. Sherwood*, 312 U.S. 584, 587–88, 61 S.Ct. 767, 85 L.Ed. 1058 (1941).

The Tucker Act confers upon the Court of Federal Claims jurisdiction to "render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2000). Although the Tucker Act waives the sovereign immunity of the United States for claims for money damages, it "itself does not create a substantive cause of action; in order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages." *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed.Cir. 2005) (en banc in part). The separate source of substantive law must constitute a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States." *Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545, 1554 (Fed.Cir.1994) (en banc). "[I]n order for a claim against the United States founded on statute or regulation to be successful, the provisions relied upon must contain language which could fairly be interpreted as mandating recovery of

compensation from the government." *Cummings v. United States*, 17 Cl.Ct. 475, 479 (1989) (citations omitted), *aff'd*, 904 F.2d 45 (Fed.Cir.1990); *see also United States v. Testan*, 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976) (stating that a "grant of a right of action must be made with specificity").

The Court of Federal Claims "may not entertain claims outside [its] specific jurisdictional authority." *Adams v. United States*, 20 Cl.Ct. 132, 135 (1990). Consequently, it must, "at the outset," determine whether the constitutional provision upon which a claim is based is one that is money-mandating. *Fisher*, 402 F.3d at 1173. As the United States Court of Appeals for the Federal Circuit ("Federal Circuit") has stated,

> [i]f the court's conclusion is that the Constitutional provision, statute, or regulation meets the money-mandating test, the court shall declare that it has jurisdiction over the cause, and shall then proceed with the case in the normal course. For purpose of the case before the trial court, the determination that the source is money-mandating shall be determinative both as to the question of the court's jurisdiction and thereafter as to the question of whether, on the merits, plaintiff has a money-mandating source on which to base his cause of action.

*Id.* The Court of Federal Claims possesses jurisdiction over takings claims, *Murray v. United States*, 817 F.2d 1580, 1583 (Fed.Cir.

1987), and "[i]t is undisputed that the Takings Clause of the Fifth Amendment is a money-mandating source for purposes of Tucker Act jurisdiction," *Jan's Helicopter Serv., Inc. v. FAA*, 525 F.3d 1299, 1309 (Fed. Cir.2008); *see also Moden v. United States*, 404 F.3d 1335, 1341 (Fed.Cir.2005) ("[T]he Takings Clause of the Fifth Amendment is money-mandating. Thus, to the extent [plaintiff has] a nonfrivolous takings claim founded upon the Fifth Amendment, jurisdiction under the Tucker Act is proper."[7]); *Russell v. United States*, 78 Fed.Cl. 281, 289 (2007) ("The Takings and Just Compensation Clauses of the Fifth Amendment do constitute a money-mandating source and claims under these clauses are within the jurisdiction of the court.").

### D. Statute of Limitations

The statute of limitations for claims filed in the Court of Federal Claims is contained in 28 U.S.C. § 2501 (2000), which provides: "Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." Because section 2501 "is a jurisdictional requirement for a suit in the Court of Federal Claims," *John R. Sand & Gravel Co. v. United States*, 457 F.3d 1345, 1354 (Fed.Cir.2006), *aff'd*, —— U.S. ——, 128 S.Ct. 750, 169 L.Ed.2d 591 (2008), and serves "as a condition of the government's waiver of sovereign immunity[,] . . . [it] must be strictly construed," *Hopland Band of Pomo Indians*

---

7. Whereas the *Moden* court concluded that it had jurisdiction to reach the merits of plaintiffs' case because the plaintiffs' claim was "neither frivolous, nor so insubstantial, implausible, foreclosed by prior decisions, or otherwise completely devoid of merit as not to involve a federal controversy," 404 F.3d at 1341–42, the Federal Circuit subsequently held in *Jan's Helicopter Service, Inc.* that the jurisdictional requirement of a nonfrivolous claim did not apply to complaints filed in the Court of Federal Claims, *see* 525 F.3d at 1309 (explaining that once the court determines that a claim is founded upon a money-mandating source and that a plaintiff has "made a nonfrivolous allegation that it is within the class of plaintiffs entitled to recover under the money-mandating source[, t]here is no further jurisdictional requirement that the court determine whether the additional allegations of the complaint state a nonfrivolous claim on the merits"). As the court noted in *Briseno v. United States*, "[i]f there is

direct, irreconcilable conflict between two panel decisions of the Federal Circuit, the earlier decision is controlling precedent." 83 Fed.Cl. 630, 633 n. 5 (2008) (citing *Newell Cos. v. Kenney Mfg. Co.*, 864 F.2d 757, 765 (Fed.Cir.1988)). However, "the *Jan's Helicopter* panel announced that any contrary aspects of the *Moden* discussion of the 'nonfrivolous' claim issue were *dicta* . . . ." *Id.*; *see Jan's Helicopter Service, Inc.*, 525 F.3d at 1308 n. 9 ("In any event, the court's statements [in *Moden*], quoted at page 4 of the dissent, are dicta, and we are not bound by them. . . ."). Consequently, the *Briseno* court was "constrained to follow *Jan's Helicopter* as controlling precedent even though it is the later-issued circuit decision." 83 Fed.Cl. at 633 n. 5. For the reasons set forth in Parts III.A–B., *infra*, the court need not reach the question of whether plaintiff states a nonfrivolous takings claim under either the *Moden* or *Jan's Helicopter Service, Inc.* standard.

*v. United States,* 855 F.2d 1573, 1576–77 (Fed.Cir.1988). "Consequently, compliance with 28 U.S.C. § 2501 is a prerequisite to the Court's subject matter jurisdiction in takings cases." *Int'l Indus. Park, Inc. v. United States,* 80 Fed.Cl. 522, 525 (2008).

## III. DISCUSSION

Defendant presents two arguments in support of its motion. First, it argues that plaintiff's complaint asserts an alleged takings claim that improperly collaterally attacks his previous civil and criminal proceedings before both the Western District of Pennsylvania and the Third Circuit. Def.'s Mot. 4; Def.'s Reply 1–2. Second, defendant maintains that plaintiff's takings claim is "beyond this Court's six-year statute of limitations." Def.'s Mot. 5; *accord* Def.'s Resp. Pl.'s Sur–Reply ("Def.'s Resp.") 1–5. The court addresses defendant's statute of limitations argument first.

### A. Plaintiff's Takings Claim Is Barred by the Court's Six-Year Statute of Limitations

Plaintiff filed his complaint in this court on December 3, 2007. *See supra* note 6. Accordingly, in order for plaintiff's complaint to be timely filed within the applicable six-year limitations period, plaintiff's claim for the purported Fifth Amendment taking must have accrued no earlier than December 3, 2001. Plaintiff offers several dates upon which he believes his claim accrued. First, plaintiff argues that he was unaware of his claim against defendant until August 27, 2003, contending that "[i]t was at that time that Plaintiff discovered that Defendant was concealing the market value of the investment contract not only from Plaintiff but also from FMS customers...." Pl.'s Sur–Reply 8. Alternatively, plaintiff states that his claim accrued on January 13, 2004, the date upon which the United States Supreme Court ("Supreme Court") decided *SEC v. Edwards,* 540 U.S. 389, 124 S.Ct. 892, 157 L.Ed.2d 813 (2004). *Id.* In his response to defendant's motion to dismiss, plaintiff suggests a third

alternative: he "had no prior knowledge" that the market value of the CIA was " 'litigated and resolved' " until the Western District of Pennsylvania issued an order on December 13, 2005. Pl.'s Resp. 5. Finally, as a fourth alternative, plaintiff argues that the "statute of limitations continues to toll for as long as Defendant continues to conceal the market value of the investment contract." Pl.'s Sur–Reply 8.

█ "A cause of action cognizable in a Tucker Act suit accrues as soon as all events have occurred that are necessary to enable the plaintiff to bring suit, i.e., when 'all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here for his money.' " *Martinez v. United States,* 333 F.3d 1295, 1303 (Fed.Cir.2003) (en banc) (quoting *Nager Elec. Co. v. United States,* 177 Ct.Cl. 234, 368 F.2d 847, 851 (1966)); *accord Goodrich v. United States,* 434 F.3d 1329, 1333 (Fed.Cir. 2006) ("A claim accrues 'when the events have occurred which fix the liability of the Government and entitle the claimant to institute an action.' " (quoting *Hopland Band of Pomo Indians,* 855 F.2d at 1576–77)). A claim alleging a Fifth Amendment taking " 'accrues when that taking action occurs.' " *Goodrich,* 434 F.3d at 1333 (quoting *Alliance of Descendants of Tex. Land Grants v. United States,* 37 F.3d 1478, 1481 (Fed.Cir.1994)). However, a claim is suspended, for purposes of 28 U.S.C. § 2501, until such time as the claimant "knew or should have known that the claim existed." *Martinez,* 333 F.3d at 1319; *accord Kinsey v. United States,* 852 F.2d 556, 557 n. * (Fed.Cir.1988) ("It is worth noting that a claim does not accrue unless the claimant knew or should have known that the claim existed."). This principle, referred to as the accrual suspension rule, "is well settled in our cases." *Martinez,* 333 F.3d at 1319. Application of the accrual suspension rule is "distinct from the question whether equitable tolling is available" under 28 U.S.C. § 2501.[8] *Young,* 529 F.3d at 1384.

---

8. Nevertheless, as the Federal Circuit in *Young v. United States* acknowledged, "the term 'tolling' is sometimes used in describing the [accrual suspension] rule." 529 F.3d 1380, 1384 (Fed.Cir. 2008) (quoting *Martinez,* 333 F.3d at 1319). For example, the court in Young, which addressed the accrual suspension rule, relied upon *Catawba Indian Tribe of South Carolina v. United States,* 982 F.2d 1564 (Fed.Cir.1993), in support of its contention that a plaintiff's knowledge of the

448

## 1. Plaintiff Has Not Demonstrated That the Accrual Suspension Rule Applies in This Case

■ The accrual suspension rule "is strictly and narrowly applied: 'Plaintiff must either show that defendant has concealed its acts with the result that plaintiff was unaware of their existence or [he] must show that [his] injury was 'inherently unknowable' at the accrual date.'" *Welcker v. United States,* 752 F.2d 1577, 1580 (Fed.Cir.1985) (quoting *Japanese War Notes Claimants Ass'n v. United States,* 178 Ct.Cl. 630, 373 F.2d 356, 359 (1967)). Therefore, "[i]t is a plaintiff's knowledge of the facts of the claim that determines the accrual date." *Young,* 529 F.3d at 1385. A plaintiff's misunderstanding of the meaning of the law or his legal rights does not permit the court to apply a later accrual date. *See United States v. Kubrick,* 444 U.S. 111, 122, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979) ("We are unconvinced that for statute of limitations purposes a plaintiff's ignorance of his legal rights and his ignorance of the fact of his injury or its cause should receive identical treatment."); *accord Catawba Indian Tribe of S.C.,* 982 F.2d at 1572 ("But in the case before us, all the relevant *facts* were known. It was the meaning of the law that was misunderstood."); *Japanese War Notes Claimants Ass'n,* 373 F.2d at 359 ("Ignorance of rights which should be known is not enough.").

■ As noted above, plaintiff must, in order to invoke the accrual suspension rule, show that either (1) defendant concealed its acts such that he was unaware of their existence, or (2) his injury was inherently unknowable at the accrual date. *Welcker,* 752 F.2d at 1580. With respect to the first showing, plaintiff argues that defendant "concealed and continues to conceal the market value of the investment contract owned by the customers of Plaintiff's corporations." Pl.'s Sur–Reply 1. It appears that plaintiff contends that the SEC concealed what plaintiff believes is the proper interpretation of

the law that governs how the CIA should be valuated. *See* Pl.'s Resp. 7 ("Plaintiff has alleged that the Government took his asset[s] by filing a complaint alleging that FMS had violated 15 [U.S.C.] § 78j(b) and § 77q(a)."); Pl.'s Sur–Reply 7 ("Defendant's September 26, 1997 complaint does not state a single transaction that was conducted in violation of 15 [U.S.C.] §§ 77q(a) or 78j(b)."). As a result of this alleged concealment, plaintiff claims that the "Government allowed the assets of [FMS] as well as Plaintiff's other companies to be wasted, lost, distributed and or destroyed[,] resulting in a loss of over $30 million to Plaintiff." Pl.'s Resp. 7–8.

This alleged concealment, however, does not relate to defendant's acts that underlie plaintiff's takings claim. At no point does plaintiff allege or argue that he was unaware of the disposition of the investment contracts during the course of the civil and criminal actions against him. Instead, plaintiff's arguments focus almost exclusively upon defendant's valuation of these assets. Plaintiff was certainly aware of defendant's actions concerning these assets as of September 26, 1997, the date upon which his "operations were placed in trusteeship" by the Western District of Pennsylvania. Def.'s App. 1 at 10. Plaintiff also does not dispute that the Western District of Pennsylvania issued an order of disgorgement, entered a permanent injunction, and imposed civil penalties against him. Indeed, plaintiff himself refers to September 26, 1997, as the date of reference for determining the value of his property and contracts. *See, e.g.,* Compl. Prayer for Relief (seeking $7 million book value for the value of FMS, $36 million for the surplus of the contracts between FMS and its clients "worth a present value on September 26, 1997," and $1 million for the value of Devon "estimated ... on September 26, 1997"); Pl.'s Sur–Reply 1 ("Defendant has profited by its continued concealment by not compensating Plaintiff or the owners of the investment

facts of the claim determine the accrual date. *See* 529 F.3d at 1385. The *Catawba Indian Tribe of South Carolina* court, however, indicated that "the avoidance of penalizing a plaintiff simply because under the circumstances plaintiff did not and could not have known of the *facts* upon

which the claim is based" was "a traditional ground for equitable tolling of a statute of limitations...." 982 F.2d at 1572. The court addresses plaintiff's equitable tolling argument in Part III.A.3, *infra.*

contracts for the value of those contracts on September 26, 1997."). Consequently, plaintiff has not demonstrated that defendant concealed any acts related to the alleged taking of these assets such that he would be unaware of their existence. To the contrary, the evidence demonstrates that plaintiff was fully aware of his circumstances as of September 26, 1997.

With respect to the second showing, plaintiff has failed to demonstrate that his injury was inherently unknowable as of September 26, 1997. As discussed above in relation to the first showing, plaintiff cannot dispute that he was cognizant of the fact that his property was placed in trusteeship by the district court. As the Supreme Court explained in *Kubrick,*

> [t]hat [plaintiff] has been injured in fact may be unknown or unknowable until the injury manifests itself; and the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain. The prospect is not so bleak for a plaintiff in possession of the critical facts. . . . There are others who can tell him if he has been wronged, and he need only ask.
>
>     . . . .
>
>     . . . A plaintiff . . . armed with the facts about the harm done to him[ ] can protect himself by seeking advice in the . . . legal community. To excuse him from promptly doing so by postponing the accrual of his claim would undermine the purpose of the limitations statute. . . . If he fails to bring suit because he is incompetently or mistakenly told that he does not have a case, we discern no sound reason for visiting the consequences of such error on the defen-

dant by delaying the accrual of the claim until the plaintiff is otherwise informed or himself determines to bring suit, even though more than two years have passed from the plaintiff's discovery of the relevant facts about injury.[9]

444 U.S. at 122–24, 100 S.Ct. 352 (footnote added).

All of the events that "fix[ed] the Government's alleged liability, entitling the claimant to demand payment and sue here for his money," *Martinez,* 333 F.3d at 1303, occurred when the district court "entered a permanent injunction—consented to by Mr. Black—ordering disgorgement of ill-gotten gains and an assessment of civil penalties." [10] Def.'s Resp. 3. Plaintiff then unsuccessfully challenged both the enforcement and criminal actions brought against him in the Western District of Pennsylvania and the Third Circuit. That plaintiff failed—or was unaware of his ability—to institute a timely action in this court asserting a takings claim does not permit the court to apply the accrual suspension rule to the facts of this case, particularly in the absence of plaintiff satisfying the requisite showing. Therefore, plaintiff's contentions that his action first accrued on either August 27, 2003, or December 13, 2005, are unsupported by the evidence presented to the court. The district court's September 27, 1997 order placing plaintiff's operations in trusteeship, its entry of a permanent injunction on December 15, 1997, and its April 29, 1998 order of disgorgement and assessment of civil penalties against plaintiff, *see Black,* No. 97–CV–02257, (W.D.Pa.), occurred well outside the six-year limitations period.[11]

9. In *Kubrick,* the Supreme Court addressed the two-year statute of limitations contained in the Federal Tort Claims Act, holding that a claim accrued within the meaning of that provision when the plaintiff knew both the existence and the cause of his injury, rather than when a plaintiff learns that his injury was negligently inflicted. 444 U.S. at 117–22, 100 S.Ct. 352. Although the circumstances in *Kubrick* are readily distinguishable from the instant case, the court's reasoning is nevertheless relevant and instructive.

10. The district court entered a permanent injunction on December 15, 1997, and issued an order

of disgorgement and assessed civil penalties against plaintiff on April 29, 1998. *See SEC v. Black,* No. 97–CV–02257 (W.D.Pa.).

11. The fines and penalties imposed by the district court in plaintiff's civil case directly resulted from plaintiff's illegal conduct. That plaintiff was required to forfeit property and pay civil fines as a result of his violations of, *inter alia,* securities laws cannot be construed as a compensable taking. Rather, those civil penalties assessed against plaintiff, as with his conviction and incarceration in the criminal case, were the direct consequence flowing from plaintiff's federal securities laws violations.

450

## 2. The Supreme Court's Decision in *Edwards* Is Not Relevant to Determining When Plaintiff's Claim Accrued

Alternatively, plaintiff contends that his claim accrued when the Supreme Court issued its decision in *Edwards* on January 13, 2004. Pl.'s Sur–Reply 8. In *Edwards,* the Supreme Court addressed whether a sale-and-leaseback arrangement was "excluded from the term 'investment contract' simply because the scheme offered a contractual entitlement to a fixed, rather than a variable, return." 540 U.S. at 391, 124 S.Ct. 892. It held that "an investment scheme promising a fixed rate of return can be an 'investment contract' and thus a 'security' subject to the federal securities laws." *Id.* at 397, 124 S.Ct. 892. Applying the test it previously set forth in *SEC v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), to determine whether a particular scheme was an investment contract, the Supreme Court concluded that there was no reason to distinguish between promises of fixed returns and variable returns. 540 U.S. at 393–95, 124 S.Ct. 892. It further noted that the SEC had been consistent in maintaining that "a promise of a fixed return does not preclude a scheme from being an investment contract." *Id.* at 396, 124 S.Ct. 892. *Edwards* simply reiterated that Congress broadly defined the term "security" in the Securities Act of 1933 and the Securities Exchange Act of 1934. *Id.* at 393, 124 S.Ct. 892. Nothing that the Supreme Court articulated in *Edwards* supports plaintiff's position that his claim accrued as of the date of that case's issuance.[12] As such, the Supreme Court's decision in *Edwards* is not relevant to the court's determination of when plaintiff's claim accrued.

## 3. Equitable Tolling Is Unavailable to Plaintiff

Finally, plaintiff argues that the statute of limitations "continues to toll for as long as [d]efendant continues to conceal the market value of the investment contract[s]." Pl.'s Sur–Reply 8. However, as discussed in Part II.D., *supra,* equitable tolling of 28 U.S.C. § 2501 is foreclosed by the Supreme Court's decision in *John R. Sand & Gravel Co.* Therefore, any claim instituted beyond the six-year limitations period set forth in 28 U.S.C. § 2501 falls outside the scope of this court's jurisdiction.

To summarize, the court rejects plaintiff's arguments that his action accrued within the six years predating December 3, 2007, the date upon which he filed his complaint in the Court of Federal Claims. *See supra* note 6. Plaintiff initiated this lawsuit after the applicable statute of limitations period expired. Therefore, the court lacks jurisdiction to entertain plaintiff's Fifth Amendment takings claim.

## B. Alternatively, Assuming, *Arguendo,* That Plaintiff Timely Instituted This Action, the Court Lacks Jurisdiction Over Plaintiff's Alleged Takings Claim

Plaintiff maintains that he asserts a takings claim entitling him to relief "guaranteed by the Fifth Amendment to the United States Constitution, which confers jurisdiction upon this Court." Pl.'s Resp. 8. Defendant contends that plaintiff's action is merely "asserted in the guise of a takings claim," Def.'s Mot. 1, because plaintiff's claim stems from the " 'taking' of the investment contracts in the course of civil and criminal actions" against him, Def.'s Resp. 3. Defendant's argument, essentially, is that the court is not bound by mere labels or plaintiff's own characterization of his pleading.[13]

## 1. Plaintiff May Not Utilize a Takings Claim to Collaterally Attack Proceedings in Other Fora

■ According to defendant, plaintiff's alleged takings claim simply constitutes a collateral attack upon issues underlying the civil and criminal actions against him in both the Western District of Pennsylvania and the

---

12. Plaintiff states that *Edwards* "expanded and redefined an investment contract" and asserts that it supports his contention that the FMS investment contracts were worth $269 million. Pl.'s Sur–Reply 5. This contention, however, does not support a finding that plaintiff's cause of action accrued on January 13, 2004.

13. Indeed, courts are "not bound by the labels selected by a party in characterizing an action." *Wheeler v. United States,* 3 Cl.Ct. 686, 688 (1983).

Third Circuit. Def.'s Mot. 5. Defendant argues that such a "challenge to the merits of the SEC's enforcement action and the Government's criminal action against him can only be decided" by those two tribunals. *Id.* Specifically, defendant maintains that plaintiff's arguments in this case relate to the fact that the government "misinterpreted or misrepresented the effect of 26 C.F.R. § 1.148–5 upon the valuation of certain assets" during the civil and criminal cases. *Id.* at 4. Defendant emphasizes that "the filings, orders, and opinions in those cases provided by both parties show that Mr. Black has raised the issue of the valuation of the Collateralized Investment Agreements ... before the district court and upon appeal...." Def.'s Reply 2. As a result, defendant asserts, plaintiff's claim "represent[s] an improper attempt by Mr. Black to collaterally attack the proceedings" conducted in the district court and the Third Circuit. Def.'s Resp. 1.

Plaintiff disputes defendant's characterization and emphasizes that he "is not utilizing a takings claim to attack another court's judgment." Pl.'s Sur–Reply 4. In fact, plaintiff claims that "[t]here is no judgment of another court that is being collaterally attacked because no final judgment has been entered." *Id.* at 5; *accord id.* at 6 (stating that the Third Circuit determined that there had been no final judgment entered against the corporations); cf. Pl.'s Resp. 1 (arguing that "the Government has not stated what judgment Plaintiff is collaterally attacking"). Instead, plaintiff states that he is "relying upon those judgments, orders and brief ... to support this action." Pl.'s Sur–Reply 4.

"Even though an action has an independent purpose and contemplates some other relief, it is a collateral attack if it must in some fashion overrule a previous judgment." *Miller v. Meinhard–Commercial Corp.*, 462 F.2d 358, 360 (5th Cir.1972). The Supreme Court has stated that "[i]t is generally true that a judgment by a court of competent jurisdiction bears a presumption of regularity and is not thereafter subject to collateral attack." *Kalb v. Feuerstein*, 308 U.S. 433,

438, 60 S.Ct. 343, 84 L.Ed. 370 (1940). Thus, the Court of Federal Claims "cannot entertain a taking claim that requires the court to 'scrutinize the actions of' another tribunal." *Vereda, Ltda. v. United States*, 271 F.3d 1367, 1375 (Fed.Cir.2001) (quoting *Allustiarte v. United States*, 256 F.3d 1349, 1352 (Fed.Cir.2001)). Rather, as the court explained in *Ullman v. United States*, "[t]he proper course for a dissatisfied litigant to redress legal errors is through appeal, not by collateral attack on the judgment in a separate lawsuit." 64 Fed.Cl. 557, 571 (2005); *accord Allustiarte*, 256 F.3d at 1352 (indicating that the proper course for a party dissatisfied with a bankruptcy court decision was to seek judicial review in the district court, followed by the court of appeals, and not to institute a separate action in the Court of Federal Claims).

As noted above, plaintiff appealed both the judgment in the civil enforcement action against him and his criminal conviction.[14] Plaintiff's instant complaint asks the court to revisit the rulings of the Western District of Pennsylvania and the Third Circuit. In fact, the first paragraph of plaintiff's complaint references these proceedings and alleges that the SEC, "*in a brief filed with the Third Circuit Court of Appeals*, ... admitted that neither it nor the Department of Justice had followed published federal regulations...." Compl. ¶ 1 (emphasis added). Furthermore, plaintiff acknowledges that "[i]n all prior proceedings, the Government has implied that the CIA was worth only the liquidation value of the collateral owned by" FMS. Pl.'s Resp. 4. Thus, plaintiff had ample opportunity to present arguments to the contrary in each of these prior proceedings. *See, e.g.*, Pl.'s Sur–Reply 4 (stating that the SEC's September 26, 1997 complaint "alleged that Plaintiff had overstated the market value of a single investment").

Indeed, plaintiff himself concedes that he previously raised these arguments before other tribunals. For example, plaintiff notes that he has argued that the value of the CIA

---

**14.** Plaintiff, as noted in Part I, *supra*, pled guilty to twenty-six counts, was imprisoned for forty-one months, and attacked his sentence on at least two previous occasions. *See* Pl.'s Resp. Ex. 7 at

4–5 (containing the Third Circuit's order construing plaintiff's motion to set aside his conviction as his second section 2255 motion).

exceeded $269 million on at least three separate occasions: (1) on September 30, 2005, in a motion to dismiss his indictment on the grounds of prosecutorial misconduct; (2) on December 13, 2006, in a motion to set aside his indictment; and (3) on March 13, 2007, in a motion to set aside his indictment filed with the Third Circuit. Pl.'s Resp. 7. Plaintiff also raised the issue of valuation with the Third Circuit in a February 27, 2007 brief appealing the civil enforcement action against him. *See* Def.'s App. 2 (arguing in his brief that the SEC's complaint failed to state the CIAs' market value of $233 million, maintaining that the complaint "does not allege that any transaction in the CIA was conducted at non-market values," and stating that the SEC's conduct resulted in "two solvent, debt free corporations [being] placed into receivership"). Furthermore, plaintiff acknowledges that the Western District of Pennsylvania "litigated the value of the Collateralized Investment Agreement," although he maintains that he was precluded from participating in that litigation. Pl.'s Resp. 4.

The Third Circuit, in affirming the district court's denial of plaintiff's Rule 60(b) motion, concluded that "Black did not state that the SEC's alleged misconduct prevented him from fully and fairly presenting these issues in his case initially." *Black,* 262 Fed.Appx. at 363. The court further explained that a motion filed pursuant to Rule 60(b) "cannot serve a substitute for a direct appeal." *Id.* (citing *Smith v. Evans,* 853 F.2d 155, 158 (3d Cir.1988)). As indicated above, plaintiff has already asserted the arguments he presents in the instant case in prior proceedings that were conducted in the proper fora. Plaintiff cannot recast the valuation issue as a takings claim in the Court of Federal Claims in order to seek an alternative forum in which to raise the same issues that he already presented and to try to obtain a different outcome. *See, e.g.,* Def.'s App. 2 (containing plaintiff's informal brief filed with the Third Circuit in February 2007 in which he appealed his civil enforcement action and requested, among other things, that the circuit court "grant a

change of venue to another court that may not be so compromised"). Consequently, plaintiff cannot relitigate these issues—cloaked as a takings action—in the Court of Federal Claims because doing so would require the court to scrutinize the actions of the district court and the Third Circuit.[15] *See Vereda, Ltda.,* 271 F.3d at 1375.

### 2. Plaintiff May Not Assert a Takings Claim in an Effort to Challenge Agency Action

■ Defendant also argues that plaintiff's "claims in this Court are premised upon his challenge to the validity of the Securities and Exchange Commission's actions." Def.'s Reply 2. Plaintiff maintains that he "is not challenging the validity of agency actions." Pl.'s Sur–Reply 6. However, the allegations supporting plaintiff's alleged takings claim can be construed as such a challenge. *See, e.g.,* Compl. ¶¶ 8, 11 (alleging that the SEC failed to comply with federal regulations); *id.* ¶ 9 (alleging that defendant caused the "forced liquidation" and failed to state the valuation of investments); *see also* Pl.'s Resp. 8 (arguing that "[u]nder the color of law, the Government took Plaintiff's assets, did not prosecute, and prevented Plaintiff from litigating"); Pl.'s Sur–Reply 7 ("This action was brought to recover the value of the two corporations Defendant took under the color of law and then did not pursue the litigation."). Plaintiff claims that defendant "knew the market value" of the investment contracts at issue either when it obtained a grand jury indictment or in August 2003 and maintains that the SEC has profited from its concealment by refusing to distribute the assets of these contracts. Pl.'s Sur–Reply 10. Furthermore, plaintiff suggests that the SEC acted contrary to federal securities statutes and regulations. *See, e.g.,* Compl. ¶ 19 (alleging that plaintiff complied with 26 C.F.R. § 1.148–5(d)(1)(i)–(iii), (6)(iii), but implying that the SEC, by instituting its enforcement action against plaintiff, ignored these provisions).

---

15. Similarly, the court declines to enter an order collaterally estopping defendant "from denying that the market value of the CIA was less than $269 million," Pl.'s Resp. 8, such that plaintiff could seek to relitigate previously resolved issues in either the Western District of Pennsylvania or the Third Circuit.

The Tucker Act "does not create jurisdiction in the Court of Federal Claims for a party contesting the propriety of a taking." *Crocker v. United States*, 125 F.3d 1475, 1476 (Fed.Cir.1997) (citing *Fla. Rock Indus., Inc. v. United States*, 791 F.2d 893, 898–99 (Fed. Cir.1986)). Thus, in takings jurisprudence, a plaintiff must concede the validity of the government action that forms the basis for a takings claim. *See Fla. Rock Indus., Inc.*, 791 F.2d at 898–99. Plaintiff has not conceded the validity of the SEC's actions,[16] and "[n]either the Court of Federal Claims nor [the Federal Circuit] may entertain a collateral challenge to the validity of [agency] actions." *M & J Coal Co. v. United States*, 47 F.3d 1148, 1154 (Fed.Cir.1995) (indicating that it was "uncontestable" that the actions taken by the Department of the Interior's Office of Surface Mining Reclamation and Enforcement were legitimate exercises of authority pursuant to the Surface Mining Control and Reclamation Act of 1977, noting that the plaintiff did not appeal an adverse decision from the agency's appellate tribunal, and indicating that the plaintiff elected not to challenge the validity of the agency's actions in federal district court). Any challenge plaintiff sought to make against the SEC's actions should have been made—and apparently were made—in his prior proceedings. *See M & J Coal Co. v. United States*, 30 Fed.Cl. 360, 368 (1994) (concluding that the plaintiff's "only cognizable expectation was that [the agency] would act within scope of its regulatory authority," that the agency's actions were already deemed legitimate exercises of its authority, and that the Court of Federal Claims "cannot at this juncture relitigate that issue"), *aff'd*, 47 F.3d at 1149.

### C. The Court Lacks Jurisdiction Over Tort Claims

To the extent that plaintiff's complaint can be construed to allege that defendant engaged in any tortious conduct, *viz.*, wrongful concealment, misrepresentation, or prosecu-

torial misconduct, such claims fall outside this court's jurisdiction. As noted above, the Tucker Act expressly provides that the "United States Court of Federal Claims shall have jurisdiction ... in *cases not sounding in tort.*" 28 U.S.C. § 1491(a)(1) (emphasis added); *see also Shearin v. United States*, 992 F.2d 1195, 1197 (Fed.Cir.1993) (stating that it is "well settled that the United States Court of Federal Claims lacks ... jurisdiction to entertain tort claims"); *Pratt v. United States*, 50 Fed.Cl. 469, 482 (2001) (providing that the court "lacks jurisdiction to award plaintiff's prayer for damages for emotional distress and pain and suffering"). Therefore, "[t]o the extent that ... allegations sound in tort, the Court of Federal Claims lacks jurisdiction under the Tucker Act...." *Alves v. United States*, 133 F.3d 1454, 1459 (Fed.Cir. 1998).

### D. The Court Lacks Jurisdiction Over Fifth Amendment Due Process Claims

Finally, plaintiff claims that defendant's actions "constitute ... the denial of Plaintiff's due process rights which he is guaranteed by the Fifth Amendment to the United States Constitution, which confers jurisdiction upon this Court." Pl.'s Resp. 8. Although the Court of Federal Claims possesses jurisdiction to entertain claims arising under the Just Compensation Clause of the Fifth Amendment, *see supra* Part II.C., the same cannot be said for the Due Process Clause. *See, e.g., James v. Caldera*, 159 F.3d 573, 581 (Fed.Cir.1998) (stating that it is "well established" that the Court of Federal Claims lacks jurisdiction over Fifth Amendment due process claims because the Due Process Clause is not a money-mandating provision); *LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir.1995) (indicating that the Due Process Clause of the Fifth Amendment is an insufficient basis for jurisdiction because it

---

16. Plaintiff suggests that the SEC's actions were contrary to the Supreme Court's decision in *Edwards*, which he interprets as "requir[ing] the value of an investment contract to be determined by the value of the investment contract in question and not on the profitability of the enterprise." Pl.'s Sur–Reply 9. *Edwards*, as discussed in Part III.A.2, *supra*, simply accepted the SEC's

broad interpretation of federal securities laws. As the Federal Circuit noted in *Hyatt v. Boone*, "[r]egularity of routine administrative procedures is presumed, and departure therefrom, should such have occurred, is not grounds of collateral attack." 146 F.3d 1348, 1355–56 (Fed. Cir.1998).

"do[es] not mandate payment of money by the government"). Therefore, the court may not entertain any claim in which plaintiff alleges that defendant violated his due process rights.

## IV. CONCLUSION

For the reasons stated above, defendant's motion to dismiss is **GRANTED,** and plaintiff's complaint is **DISMISSED WITHOUT PREJUDICE.** Furthermore, plaintiff's request that the court enter an order collaterally estopping defendant from denying that the market value of the CIAs was less than $269 million is **DENIED.** The Clerk of Court is directed to enter judgment in accordance with this Opinion and Order. Costs to defendant.

**IT IS SO ORDERED.**